ANDERSON YEH PC
  Edward M. Anderson (STATE BAR NO. 198183)
  Regina Yeh (STATE BAR NO. 266019)
401 Wilshire Boulevard, 12th Floor
Santa Monica, California  90401
Telephone: (310) 496-4270  Facsimile: (888) 744-0317
edward@andersonyehlaw.com
regina@andersonyehlaw.com

Attorneys for Plaintiff
JANICE DICKINSON

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| JANICE DICKINSON, an individual,<br><br>                Plaintiff,<br><br>        v.<br><br>RYAN SEACREST ENTERPRISES INC., a California Corporation; TRULY ORIGINAL, LLC, a Delaware Limited Liability Company; SUN PRODUCTIONS, LLC, a Limited Liability Company, state of organization unknown; TESS CANNON, an individual; NBCUNIVERSAL MEDIA, LLC, a Delaware Limited Liability Company; ERIK ROSETTE aka ERIK ROSETE aka MISTER TRIPLE X, an individual; and DOES 1-20, inclusive,<br><br>                Defendants. | CASE NO.<br><br><br>**COMPLAINT FOR:**<br><br>**(1) FALSE ENDORSEMENT IN VIOLATION OF 15 U.S.C. § 1125(a)(1)(A);**<br><br>**(2) FALSE ADVERTISING IN VIOLATION OF 15 U.S.C. § 1125(a)(1)(B);**<br><br>**(3) DILUTION IN VIOLATION OF 15 U.S.C. § 1125 (c);**<br><br>**(4) VIOLATION OF CAL. BUSINESS & PROFESSIONS CODE §§ 17200, et seq.**<br><br><br>**DEMAND FOR JURY TRIAL** |

COMPLAINT

1   Plaintiff JANICE DICKINSON ("PLAINTIFF" or "DICKINSON"), hereby

2   alleges as follows:

3

4   **JURISDICTION AND VENUE**

5   *Subject Matter Jurisdiction*

6   1.      The Court has federal question subject matter jurisdiction of the case

7   or controversy herein pursuant to 15 U.S.C. § 1121(a), 28 U.S.C. §§ 1331 and

8   1338(a) and (b), and on the grounds that this is a civil action arising under the

9   Constitution, laws, or treaties of the United States, including because PLAINTIFF

10  seeks relief under the Lanham Act, 15 U.S.C. §§ 1125(a)(1)(A) and (B) and (c), for

11  false endorsement and false advertising in interstate commerce, and dilution.  In

12  addition, the fourth claim for relief is a claim of unfair competition joined with a

13  substantial and related claim under trademark laws.

14  2.      To the extent supplemental jurisdiction is required with respect to the

15  fourth claim for relief, the Court has supplemental jurisdiction pursuant to 28

16  U.S.C. § 1367 over PLAINTIFF'S fourth claim for relief, which is a claim for

17  unfair competition under California state law, joined with substantial and related

18  claims under trademark law.  All four of PLAINTIFF'S claims for relief arise from

19  a common nucleus of operative facts, such that the state law claim is so related to

20  the federal question claims that they form part of the same case or controversy

21  under Article III of the United States Constitution.

22  *Personal Jurisdiction*

23  3.      The Court has personal jurisdiction over each of the Defendants herein

24  on the grounds that Defendants or their agents reside in the State of California and

25  this district and/or have minimum contacts with the State of California and this

26  district such that the Court has general or unlimited personal jurisdiction over each

27  and every Defendant.  In the alternative, the Court has specific or limited personal

28  jurisdiction over each of the Defendants in that each of the Defendants directed

their activities toward PLAINTIFF, who they knew to be a resident of the State of California, each of the Defendants purposefully availed themselves of the rights, privileges and protections of doing business in California including in that the television episode and series at issue was photographed in California, specifically at Los Angeles Fashion Week, and each of the Defendants participated in directing false endorsement, false advertising, dilution and acts of unfair competition to the State of California.

4.      More specifically, Defendant RYAN SEACREST ENTERPRISES INC. ("SEACREST ENTERPRISES") is a corporation organized under the laws of the State of California with its principal place of business in the County of Los Angeles, California.  Defendant TRULY ORIGINAL, LLC ("TRULY") is a limited liability company organized under the laws of the State of Delaware, and Plaintiff is informed and believes and on that basis alleges that TRULY has its principal place of business in the State of California and in the County of Los Angeles, California, and that TRULY regularly conducts business in this State and County, including the production of the television series *Shahs of Sunset* ("*Shahs*" or the "Series").  Furthermore, PLAINTIFF is informed and believes and thereon alleges that Defendant TRULY specifically and purposefully directed tortious conduct toward PLAINTIFF, whom TRULY knows resides in the State of California, County of Los Angeles

5.      PLAINTIFF is informed and believes that Defendant SUN PRODUCTIONS, LLC ("SUN PRODUCTIONS") either does not exist at all, is an unincorporated entity improperly doing business as a purported limited liability company and in fact and at law is an alias or dba or agent for one or more of the other Defendants, and/or is a limited liability company, state of organization unknown, but which regularly conducts business in this State and County, including related to production of the Series.  Furthermore, Defendant SUN PRODUCTIONS specifically and purposefully directed tortious conduct toward

1  PLAINTIFF, whom SUN PRODUCTIONS knows resides in the State of

2  California, County of Los Angeles.

3       6.    Defendant TESS CANNON ("CANNON") is an individual whom

4  Plaintiff is informed and believes and on that basis alleges resides in or is

5  domiciled in the State of California, County of Los Angeles, and CANNON further

6  regularly conducts business in this State and County, including production work on

7  film and/or television projects being filmed and/or otherwise produced here.

8  Furthermore, CANNON specifically and purposefully directed tortious conduct

9  toward PLAINTIFF, whom CANNON knows resides in the State of California,

10 County of Los Angeles.

11      7.    Defendant NBCUNIVERSAL MEDIA, LLC ("NBCUNIVERSAL")

12 has continuous and systematic contacts with the State of California such that

13 NBCUNIVERSAL is effectively domiciled here for purposes of personal

14 jurisdiction analysis.  Furthermore, NBCUNIVERSAL specifically and

15 purposefully directed tortious conduct toward PLAINTIFF, whom

16 NBCUNIVERSAL knows resides in the State of California, County of Los

17 Angeles.

18      8.    Defendant ERIK ROSETTE aka ERIK ROSETE aka MISTER

19 TRIPLE X ("ROSETTE") is an individual who resides in or is domiciled in the

20 State of California, County of Los Angeles, regularly conducts business in this

21 State and County, and purposefully directed tortious conduct toward PLAINTIFF,

22 whom ROSETTE knows resides in or is domiciled in the State of California,

23 County of Los Angeles.

24                              ***Venue***

25      9.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(a)(1),

26 (b)(1), (b)(2), (b)(3), (c)(1) and (c)(2) in that Defendants or their agents reside in

27 this district; and a substantial part of the alleged acts and omissions giving rise to

28 the claims herein occurred in this district.

**PARTIES**

*Plaintiff*

10.     DICKINSON is an individual and a citizen, resident and domiciliary of the County of Los Angeles, State of California.  DICKINSON is a famous, and indeed legendary, supermodel, a fashion and popular culture icon, and a well-recognized television and media personality, including in the reality television sphere.

*Named Defendants*

11.     PLAINTIFF is informed and believes and on that basis alleges that Defendant SEACREST ENTERPRISES is, and at all times relevant herein was, a corporation organized under the laws of the State of California with its principal place of business in this District.  PLAINTIFF is informed and believes and on that basis alleges that SEACREST ENTERPRISES is, and at all relevant times, was a producer for the Series, which is distributed in interstate commerce, including on the NBCUNIVERSAL-operated cable and satellite television network Bravo TV.

12.     PLAINTIFF is informed and believes and on that basis alleges that Defendant TRULY is a limited liability company organized under the laws of the State of Delaware and doing business in the County of Los Angeles, State of California.  PLAINTIFF is informed and believes and on that basis alleges that TRULY is, and at all relevant times was, doing business in this District and with offices in this District.  PLAINTIFF is informed and believes and on that basis alleges that TRULY is, and at all relevant times was, under its current name and also under its former name TRUE ENTERTAINMENT, a producer for the Series, which is distributed in interstate commerce, including on the NBCUNIVERSAL cable channel Bravo TV.

13.     PLAINTIFF is informed and believes and on that basis alleges that Defendant SUN PRODUCTIONS is a limited liability company organized under

the laws of the State of Delaware and doing business in the County of Los Angeles, State of California. PLAINTIFF is informed and believes and on that basis alleges that TRULY is, and at all relevant times was, doing business in this District and with offices in this District. PLAINTIFF is informed and believes and on that basis alleges that TRULY is, and at all relevant times was, under its current name and also under its former name TRUE ENTERTAINMENT, a producer for the Series, which is distributed in interstate commerce, including on the NBCUNIVERSAL cable channel Bravo TV.

14. PLAINTIFF is informed and believes and on that basis alleges that Defendant CANNON ("CANNON") is an individual who at all relevant times herein is and was a resident and domiciliary of the State of California, County of Los Angeles. PLAINTIFF is informed and believes and on that basis alleges that CANNON was a talent producer for TRULY and/or TRULY'S predecessor-in-interest for the Series during the time relevant to the facts herein.

15. PLAINTIFF is informed and believes and on that basis alleges that Defendant NBCUNIVERSAL is, and at all times relevant herein was, a limited liability company organized under the laws of the State of Delaware and doing business in this District and with offices in this District. PLAINTIFF is informed and believes and on that basis alleges that NBCUNIVERSAL does business or did business as, among other names, NBCUniversal Cable Entertainment, Bravo, and Bravo TV.

16. Defendant ROSETTE is an individual who at all relevant times herein is and was a resident and domiciliary of the State of California, County of Los Angeles. PLAINTIFF is informed and believes and on that basis alleges that at all times relevant herein, ROSETTE's regular place of work and office address was in Los Angeles County, California.

///

///

***Doe Defendants***

17. The true names and capacities, whether individual, corporate, partnership, associate or otherwise, of Defendants sued herein as DOES 1 through 20, inclusive, are currently unknown to PLAINTIFF, who therefore sues said Defendants by such fictitious names. PLAINTIFF is informed and believes, and on that basis alleges, that each of the Defendants designated herein as a DOE is legally responsible in some manner for the events and happenings referred to herein, and caused injury and damage proximately thereby to PLAINTIFF as hereinafter alleged. PLAINTIFF will seek leave to amend this Complaint to show the true names and capacities of the Defendants designated herein as DOES when the same have been ascertained. Whenever in this complaint reference is made to "Defendants," such allegation shall be deemed to mean the acts of Defendants acting individually, jointly, and/or severally.

***Agency***

18. Except as hereinafter specifically described, PLAINTIFF is informed and believes, and on that basis alleges, that at all times relevant hereto, each of the Defendants was the employer or employee, joint venturer, partner, agent, co-conspirator and/or servant of each of the remaining defendants, and in doing each and all of the things hereinafter alleged was acting within the scope and purpose of his, her or its authority as such employer, employee, joint venturer, partner, agent, co- conspirator and/or servant, and with the permission, consent, authorization, ratification, whether express or implied, and/or knowing acceptance of the benefits of the improper conduct, of each of the remaining Defendants, agents and/or employees of the other Defendants, and in acting as described herein were acting within the scope of their authority or employment as agents and/or employees thereof, and with the permission and consent of the other Defendants.

*Aiding and Abetting*

19.    Except as herein specifically described, Plaintiff is informed and believes and on that basis alleges that each of the Defendants aided and abetted the tortious conduct of the other Defendants, in that each of the Defendants either knew the other Defendants' conduct constituted a breach of duty to Plaintiff and gave substantial assistance or encouragement to said Defendants to so act, and/or gave substantial assistance to the other Defendants in accomplishing a tortious result and said aiding and abetting Defendant's own conduct constituted a breach of duty to Plaintiff.  Thus, each of the Defendants is liable for the tortious conduct of each of the other Defendants that they so aided and abetted, as if said aiding and abetting Defendants had engaged in said conduct themselves.

## FACTS COMMON TO ALL CAUSES OF ACTION

### *Dickinson's Identity and Celebrity*

20.    DICKINSON is world-famous, and indeed legendary supermodel who regularly makes professional appearances in the beauty, fashion, and entertainment industries, and has designated representatives that enter into agreements and otherwise provide authorization to third parties for the use of her appearance and celebrity, including without limitation on television series.

21.    For instance, DICKINSON has been a producer, judge, contestant, and/or guest star in the following reality television series: *America's Next Top Model, The Janice Dickinson Modeling Agency, I'm a Celebrity . . . Get Me Out of Here!, Celebrity Rehab with Dr. Drew,* and *Celebrity Big Brother.*

22.    On occasion, DICKINSON lends her appearances for runway shows and photoshoots without requiring an engagement fee, to support young and emerging designers in the fashion industry and to support other causes she believes in – but DICKINSON does not make *pro bono* appearances on reality television shows, especially reality television shows which are for profit and not for charities.

*Dickinson's Charitable Work as a Runway Model for Rosette for Los Angeles Fashion Week*

23.  DICKINSON has known ROSETTE for many years, and specifically has known him as a designer and the founder of Art Hearts Fashion, a charitable organization that produces runway shows during New York Fashion Week, Los Angeles Fashion Week, and other fashion events.

24.  Every year for approximately seven years between 2010 and 2016 inclusive, DICKINSON appeared as a runway model *pro bono* for defendant ROSETTE during Los Angeles Fashion Week, to support ROSETTE'S work with one or more charities.  ROSETTE knew and understood that DICKINSON would not appear as a runway model for ROSETTE on a *pro bono* basis (or necessarily even at all) if ROSETTE were planning to exploit DICKINSON'S celebrity without her consent, by, for example, facilitating a reality television show's exploitation of DICKINSON'S celebrity.

25.  In the fall of 2016, as she had done for the last several years prior, DICKINSON agreed to appear in ROSETTE'S runway show under his label, "Mister Triple X," to be held during Los Angeles Fashion Week in October 2016.

26.  As had always been the case in prior years, DICKINSON understood that her 2016 appearance would go towards supporting and promoting the "Mister Triple X" label and young emerging artists and designers under the Art Hearts Fashion organization, and specifically not for the promotion, marketing or advertising of any other product or program, and specifically not for a reality television show.  Accordingly, and as she had done in the past, DICKINSON agreed to ROSETTE'S request to be a model for this runway show during the sem-iannual event.

27.  Plaintiff is informed and believes and on that basis alleges that unbeknownst to DICKINSON, ROSETTE had contracted with or otherwise agreed and arranged with one or more of the other DEFENDANTS to exploit

1  DICKINSON'S appearance, without her knowledge or consent, on an episode of

2  the Series and related promotion or advertising of the Series.

3      28.   DICKINSON would not have participated in ROSETTE'S event on a

4  *pro bono* basis, or necessarily even at all, if she had known that arrangements had

5  been made between ROSETTE and one or more of other of the DEFENDANTS to

6  feature this event, and specifically DICKINSON'S appearance, as part of an

7  episode of a reality television series.  To DICKINSON's knowledge, ROSETTE

8  had never used DICKINSON'S appearance as a runway model for any of his shows

9  in connection with any other project beyond the Art Hearts Fashion organization

10 itself.

11     29.   DICKINSON would also not have agreed to appear or be featured in

12 any episode of the Series or any promotion or advertising for the Series, or to

13 endorse the Series or be associated with it, without being paid the fee she usually

14 receives for such services, or at a minimum without a negotiation with her

15 representatives regarding such a fee.

16     30.   PLAINTIFF is informed and believes and thereon alleges that

17 ROSETTE and one or more agents for SEACREST ENTERPRISES, TRULY,

18 CANNON (or CANNON herself) and/or SUN PRODUCTIONS agreed and

19 conspired (likely including with one or more of the lead actors on *Shahs*) to script

20 an episode of *Shahs* to include a false controversy in which ROSETTE,

21 SEACREST ENTERPRISES, TRULY, CANNON and/or SUN PRODUCTIONS

22 would make it appear that DICKINSON had intentionally "stolen" or essentially

23 bullied her way into wearing, an outfit which had been purported previously

24 selected for or by Golnesa Gharachedaghi (one of the *Shahs* lead actors).

25 PLAINTIFF is informed and believes and thereon alleges that this same group

26 further scripted the episode such that DICKINSON'S purported conduct in

27 "stealing" Gharachedaghi's chosen outfit would cause trauma and/or consternation

28 to Gharachedaghi, and that Gharachedaghi would then intentionally, maliciously

1   and falsely disparage PLAINTIFF on camera (but without PLAINTIFF'S
2   knowledge during photography).

3     31. PLAINTIFF is informed and believes and thereon alleges that this
4   group so conspired and scripted the episode with the intention of keeping the script
5   and their plan secret from DICKINSON, and indeed they did so.  PLAINTIFF is
6   further informed and believes and thereon alleges that the purpose of this
7   conspiracy and scripted episode was expressly with the intention and for the
8   purpose of creating an episode of *Shahs* and promotion, marketing and advertising
9   materials that would improperly trade off of the substantial good will, celebrity and
10   fame of DICKINSON, without paying DICKINSON her customary fee.
11   PLAINTIFF is further informed and believes and thereon alleges that an ongoing
12   falsity is maintained and perpetrated by DEFENDANTS, including to consumers
13   and to various industry players including the guilds, that *Shahs* is not a scripted or
14   fictional program, but rather is instead a "documentary," and that the events
15   portrayed on the Series occurred without scripting or scripted manipulation by
16   DEFENDANTS; in fact, these representations of the Series are false and it is
17   largely or entirely scripted.

18       ***The Fall 2016 Mister Triple X Show at Los Angeles Fashion Week***

19     32. On or about October 11, 2016, DICKINSON did participate in the
20   Mister Triple X runway show, which was held at the Beverly Hilton in Beverly
21   Hills, California, during the Los Angeles Fashion Week event that fall.

22     33. At the Beverly Hilton, and in a designated backstage dressing area
23   within a ballroom of the hotel in preparation for the runway show, a member of the
24   Art Hearts Fashion staff, with ROSETTE's knowledge and prior or subsequent
25   ratification or approval, directed DICKINSON to a rack of "Mister Triple X" label
26   clothing for her to select an outfit to model in the runway show.  From that rack,
27   the staff member offered DICKINSON two choices of outfits, one of which was a
28   shiny silver romper.  In execution of the above-described pre-scripted conspiracy,

1  the ROSETTE staff member strongly encouraged DICKINSON to choose the

2  romper, and otherwise intentionally manipulated DICKINSON into choosing the

3  romper – in essence and for all practical purposes, ROSETTE and his staff chose

4  the romper for DICKINSON.

5        34.    Wearing the romper, and prior to the runway show, DICKINSON

6  participated in a photo shoot for the Mister Triple X label, all as directed and

7  arranged by ROSETTE which was also set up in the backstage area, and which,

8  unknown to DICKINSON, was part of the above-described conspiracy.

9  Subsequently, DICKINSON opened and closed the Mister Triple X runway show

10  wearing the romper.

11        35.    At no time did DICKINSON sign any form of contract or release,

12  either for an appearance on the Series, or even in the Mister Triple X show, and at

13  no time prior to the airing of the Episode was she even aware that Shahs was

14  engaged in production of the Episode during her provision of services for

15  ROSETTE'S charities during Los Angeles Fashion Week, and prior to the airing of

16  the Episode, no one informed DICKINSON of the above-described pre-scripted

17  conspiracy.  Indeed, during the event, to her knowledge, DICKINSON had no

18  interactions of any kind with any representatives of any of the named

19  DEFENDANTS (other than ROSETTE), or with any of the actors on *Shahs*, and

20  specifically never had any interactions of any kind with Gharachedaghi.

21  ***Dickinson Learns that She was Featured in an Episode of Shahs of Sunset***

22        36.    After that event, DICKINSON appeared as a model for another one of

23  ROSETTE'S Mister Triple X shows, during the Los Angeles Fashion Week held in

24  the spring of 2017, and also on a charitable basis.

25        37.    However, in or about August 2017, DICKINSON learned that her

26  charitable appearance at ROSETTE's event from the fall of 2016 was exploited in

27  the Series – specifically, Episode 3 of Season 6, entitled "Hava Nagila, Hava

28  Tequila," first broadcast on Bravo TV on or about July 30, 2017.

38.     That episode shows scenes from the Art Hearts Fashion event itself, where DICKINSON walked the runway for Mister Triple X, but also shows DICKINSON preparing backstage, and also shows DICKINSON posing in the romper for a photo shoot held in that same backstage dressing area – all of which were filmed without DICKINSON's knowledge or consent, and then intentionally manipulated as further described for the express purpose of fabricating a purported excuse to feature DICKINSON prominently in both the Episode and in promotion, marketing and advertising for the Episode, all for the purpose of improperly trading off of DICKINSON'S substantial fame and good will.

39.     Furthermore, the episode deliberately fabricates a controversy between DICKINSON and one of the reality television stars in the Series.  The episode does so by intentionally creating a false, pre-scripted narrative that DICKINSON "stole" or "jacked" the romper that ROSETTE had promised to Gharachedaghi.

40.     In a scene from the episode, DICKINSON is shown in the backstage dressing area wearing the romper.  Gharachedaghi looks at DICKINSON and tells ROSETE, "What's going on with that outfit?" to which ROSETTE replies, "You got jacked."  Gharachedaghi then exhibits purported outrage at how DICKINSON "stole" her romper.  The clear intent and meaning of the exchange is to portray DICKINSON as an arrogant, unprofessional and purportedly past-her-prime celebrity attempting to push into Gharachedaghi's fashion show experience, when in fact DICKSINON had no awareness of Gharachedaghi whatsoever, conducted herself at the fashion event in a professional manner for the purpose of supporting a charity, and indeed had her outfit effectively chosen for her by ROSETTE and his staff, and displayed no arrogance or ego about the outfit choice in any way.  In short, the episode paints a false picture that DICKINSON deliberately asserted her star power to sabotage Gharachedaghi's fashion runway debut by choosing the outfit that ROSETTE had specifically designated to someone else, and does so for the intentional purpose of giving Shahs a purported excuse to feature DICKINSON

1  in the Episode and in promotion, marketing and advertising for it.

2       41.    In truth, DICKINSON was completely unaware that the romper had

3  been chosen by anyone else, and, in practical fact, ROSETTE and/or ROSETTE'S

4  staff intentionally chose the romper for DICKINSON and DICKINSON did not

5  even "choose" the romper at all; DICKINSON thus did not "steal" or "jack" the

6  romper from anyone.  Moreover, DICKINSON was in fact completely unaware

7  that the Series was being filmed amid the busy backstage area whatsoever.

8  Nonetheless, the "reality" episode then goes on to spin drama out of the wholly

9  contrived controversy, by filming Ms. Gharachedaghi's reactions to

10  DICKINSON'S seemingly selfish conduct (which again was engineered by, at a

11  minimum, ROSETTE and his staff, and PLAINTIFF is informed and believes and

12  thereon alleges, by the co-conspirators as described above).

13       42.    Plaintiff is informed and believes and on that basis alleges that

14  although the Series portrays itself and advertises itself as a "reality" show

15  purporting to depict the "true" adventures and experiences of Ms. Gharachedaghi

16  and her family and friends, in fact the Series is largely or entirely scripted.  Plaintiff

17  is informed and believes and on that basis alleges that the false controversy

18  regarding DICKINSON'S "theft" of the romper from Ms. Gharachedaghi was

19  preconceived, scripted and orchestrated by ROSETTE in coordination with one or

20  more of the DEFENDANTS, for the express purpose of leveraging DICKINSON'S

21  celebrity to increase the marketability of the episode and the Series, and

22  intentionally to do so without paying DICKINSON her established and customary

23  fee for such a reality television show appearance (which fee would have been and

24  is about $75,000 or more).

25       43.    DICKINSON was not only featured and falsely portrayed in the

26  episode itself, but her name, image, likeness and reputation were also blatantly

27  used to promote the episode and the Series in television and online advertising, as

28  well as in print media leading up to the episode's release, all without

1  DICKINSON'S knowledge or approval, and worse, all falsely painting her in the
2  promotions as a fashion runway "thief" who "stole" Gharachedaghi's chosen outfit,
3  and creating an intentionally false "reality" storyline to that effect, for the
4  intentional purpose of leveraging DICKINSON'S celebrity to promote and market
5  the Series and the episode without paying DICKINSON her reality television
6  appearance fee of $75,000 or more. *See, e.g.,* Bravo, *Shahs of Sunset: Did Janice*
7  *Dickinson Just Steal GG's Look?! (Season 6, Episode 3)*, YouTube (July 30, 2017),
8  https://www.youtube.com/watch?v=iFAQnJ74uOU. *See also* Natalie Stone, *'You*
9  *Got Jacked': Did a Stolen Sequin Romper Just Ignite Janice Dickinson's Latest*
10  *Feud?,* People.com, July 28, 2017, *available at* http://people.com/tv/golnesa-
11  gharachedaghi-janice-dickinson-feud-shahs-sunset-romper/; Paul Chavez, *'You got*
12  *jacked': GG makes runway debut on Shahs Of Sunset after Janice Dickinson*
13  *swipes her shiny silver outfit*, DailyMail.com, July 31, 2017, *available* at
14  http://www.dailymail.co.uk/tvshowbiz/article-4745352/GG-makes-runway-debut-
15  Shahs- Sunset.html.

16  ### Dickinson Confronts Defendants and Defendants Forge a Release

17       44.     After becoming aware of the episode and the promotions and
18  advertisements featuring her, DICKINSON and/or her representatives made
19  attempts to engage with the producers of the Series about how this all came to
20  happen.  In the course of those communications, the producers claimed to
21  DICKINSON's representatives that DICKINSON had in fact authorized all of the
22  above pursuant to a written release that she purportedly signed.  DICKINSON did
23  not sign any such release, and she requested to see a copy of it, as well as the
24  original.  For weeks, the producers refused to provide any such release in their
25  direct communications with DICKINSON'S representatives.

26       45.     Finally, on or about September 6, 2017, DICKINSON received an
27  email from CANNON, at an email address which DICKINSON rarely uses or
28  checks.  Plaintiff was not familiar with who CANNON was, but Plaintiff is now

1  informed and believes and on this basis alleges that CANNON was a

2  segment/talent producer for the Series at the time the episode was filmed.

3      46.    In the September 6, 2017 email, CANNON writes to DICKINSON:

4  "Just so you have this"; and attaches a document that appears to purport to be a

5  printout of an electronic release allegedly signed by DICKINSON on a mobile

6  device.  The document purports to reflect a release between "JANICE

7  DICKENSON [*sic*]" and "Sun Productions, LLC," in which DICKINSON releases

8  SUN PRODUCTIONS, NBCUNIVERSAL, and all their affiliates from a broad

9  range of liability for DICKINSON'S appearance in the Series ("Purported

10 Release").  A printed copy of the CANNON email and the Purported Release is

11 attached hereto as Exhibit A and incorporated by reference as if fully set forth

12 herein.

13     47.    DICKINSON never signed any such document, and the signature on

14 the Purported Release does not even come close to matching any signature that

15 DICKINSON has ever executed, either electronically or in writing.  A sample of

16 DICKINSON'S actual signature is attached hereto as Exhibit B.  Accordingly,

17 Plaintiff is informed and believes and on this basis alleges that DEFENDANTS, or

18 some of them, forged her signature on the Purported Release.  Furthermore,

19 DICKINSON is further informed and believes and thereon alleges that

20 CANNON'S act of uttering the forged release to DICKINSON by the September 6,

21 2017 email was at the direction of, and or with the substantial encouragement of

22 and assistance of, and/or was ratified by, each of the other DEFENDANTS.

23 PLAINTIFF is further informed and believes and thereon alleges that CANNON'S

24 act of presenting the forged release to PLAINTIFF by the September 2017 email

25 was for the intended purpose of defrauding PLAINTIFF by causing PLAINTIFF

26 not to pursue claims against DEFENDANTS or any of them, and that all

27 DEFENDANTS either caused CANNON to present the forged release to

28 PLAINTIFF for this purpose, and/or encouraged CANNON to do so with

1  knowledge that do so would be wrong or otherwise aided and abetted CANNON in

2  doing so, and/or ratified CANNON'S conduct, with knowledge that it was

3  intentionally wrongful.

4       48.   DICKINSON has demanded that DEFENDANTS provide

5  DICKINSON with the original electronic version of the purported release,

6  including so that it may be forensically and otherwise examined to determine with

7  certainty that it is in fact a forgery, and, if possible, to determine how and when the

8  forgery was created, and by whom.  DEFENDANTS have all refused to provide

9  DICKINSON with any access whatsoever to the original electronic version of the

10  forged release.

11       49.   In addition to pointedly refusing to provide the electronic original of

12  the forged release for any forensic examination or even at all, DEFENDANTS have

13  made no denial or other explanation regarding the fabricated nature of the

14  purported controversy of Plaintiff's "theft" of the romper and that the entire

15  situation was pre-planned, scripted, manipulated and orchestrated by all of the

16  DEFENDANTS (and/or ratified by all of the DEFENDANTS after the fact, with

17  knowledge of its wrongful conduct), and that the Series is in fact not a "reality"

18  series at all, but rather is in whole or in part, scripted.

19       50.   PLAINTIFF has attempted to research the corporate organization and

20  formal status of the entity listed on the forged release, "Sun Productions, LLC".  It

21  does not appear that "Sun Productions, LLC" is an organization formally organized

22  or existing under any state within the United States; nor is it listed as a producer for

23  the Series on IMDBpro or in the Series' credits – indeed, the entity appears not to

24  exist formally at all; a yet further indicator of the illicit and suspect nature of the

25  purported "release."

26       51.   To date, the episode of the Series continues to be distributed and

27  exploited, not only on BravoTV's cable broadcast, but also through BravoTV.com

28  and BravoTV's mobile app BravoNow, and through download or streaming via

- 17 -

1   Amazon Video and Hulu, among other platforms.  Use of DICKINSON's

2   appearance in the episode of the Series in advertising and promotion likewise

3   continues to be distributed and distributed.

4        52.    To date, Defendants have refused to provide DICKINSON with the

5   original electronic version of the Purported Release and its associated electronic

6   data nor have they agreed to make any correction to the false characterization of

7   the Series and the episode being presented to the public, including without

8   limitation the false endorsement of the Series by Dickinson and/or the false

9   advertising and presentation of the Series and the episode as purporting to portray

10  "true" unscripted events that Gharachedaghi and her family and friends experience,

11  when in actual fact the Series and the episode were and are largely or entirely

12  scripted.

13

14              **FIRST CLAIM FOR RELIEF**

15        *False Endorsement in Violation of 15 U.S.C. § 1125(a)(1)(A)*

16                   *against All Defendants*

17        53.    PLAINTIFF repeats, re-alleges and incorporates herein by reference

18  each and every allegation set forth in all of the foregoing paragraphs, and each

19  paragraph of this Complaint hereafter, as if set forth herein in full.

20        54.    To the extent any of the allegations or theories in this First Claim for

21  Relief are inconsistent with other allegations or theories plead in this Complaint,

22  they are plead in the alternative.

23        55.    Courts across the United States have long recognized that, especially

24  after the 1989 amendments to the Lanham Act's section 43(a) (codified at 15

25  U.S.C. section 1125(a)), that section, among other things, permits celebrities to

26  vindicate property rights in their identities against allegedly misleading commercial

27  use by others.  Courts routinely recognize a property right in celebrity identity akin

28  to that of a trademark holder under section 43(a).  Furthermore, courts recognize

that false endorsement occurs when a celebrity's identity is used in connection with a product or service in such a way that consumers are likely to be misled about the celebrity's sponsorship or approval of the product or service.

56.    PLAINTIFF is a world-famous celebrity, indeed a legendary supermodel, and owns a property right in her identity akin to that of a trademark holder.

57.    DEFENDANTS have engaged in false representations which are likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection or association of DEFENDANTS with PLAINTIFF or as to the sponsorship or approval of DEFENDANTS' goods, services or commercial activities by PLAINTIFF.

58.    Defendants are either falsely implying or stating to their intended audience that the Series is not fictional or scripted, when in fact it is actually largely or entirely fictional or scripted, and/or, to the extent that some or all of the intended audience for the Series understands that the Series is largely or entirely scripted or fictional, then Defendants are creating the false impression that DICKINSON endorsed and/or otherwise voluntarily appeared in the Series and the episode, when in fact neither are true.

59.    Defendants' unauthorized use of DICKINSON's image, likeness, and identity are false and misleading and tend to falsely describe and represent that Defendants' goods and services are licensed, sponsored, endorsed, or otherwise authorized by DICKINSON.  Defendants' unauthorized use of DICKINSON'S image, likeness, and identity in its advertisements and promotional material for the Series also represents by implication that DICKINSON endorses, sponsors, or is otherwise affiliated with the Series.  In addition and/or in the alternative, DEFENDANTS are falsely advertising the Series and the episode as a non-fictional "reality" program, when in fact the Series and the episode were and are largely or entirely fictional or scripted.

60.    DEFENDANTS' conduct is likely to cause confusion or mistake and to deceive consumers as to the endorsement, sponsorship, affiliation, connection, or association of DICKINSON with Defendants' services and products, and/or as to whether the Series and the episode are or are not wholly or partially fictional or scripted.

61.    DEFENDANTS engaged in the above conduct intentionally and in bad faith, conspiring to and then executing a fraudulent scheme falsely to create a purported justification or excuse to feature PLAINTIFF in an episode of the Series without paying PLAINTIFF any fee for doing so, for the purpose of using the draw of PLAINTIFF'S fame and goodwill to increase the viewership of the Series.  One part of this scheme, as described in foregoing paragraphs of the Complaint, was to hold out the Series as a "documentary" or non-scripted, non-fictional program, including to consumers, when in fact the truth is that the Series is largely or entirely scripted.

62.    As a direct and proximate result of Defendants' wrongful actions, Plaintiff has suffered damages in an amount to be proven at trial, but in excess of the jurisdictional minimum.

63.    Plaintiff further alleges upon information and belief that Defendants' unauthorized use of DICKINSON'S likeness, image, and identity will continue unless and until Defendants are enjoined.  Plaintiff has no adequate remedy at law to prevent Defendants from continuing to wrongfully violate Plaintiff's rights, and Plaintiff will suffer irreparable harm unless Defendants are enjoined from continuing their wrongful conduct.

64.    Defendants ROSETTE and CANNON conspired to participate in the above conduct without DICKINSON'S express written or oral consent for purposes of trade or for other commercial or advertising purposes, and took actions intended to further that conspiracy, such as, among other things:

a.  Deliberately omitting the fact that the Mister Triple X runway show

event would be filmed in connection with the Series;

b. Deliberately contriving a controversy regarding the romper, and furthering that controversy using reality television series actors from the Series so as to falsely suggest DICKINSON'S consent and knowledge of her appearance in the Series, and even interaction with the Series;

c. Intentionally and purposefully forging the Purported Release, or in the alternative, intentionally and purposefully causing DICKINSON to unknowingly execute the Purported Release, so as to allow the other producers and distributors of the Series to exploit DICKINSON'S celebrity without DICKINSON'S actual authorization or approval; and

d. Deliberately contriving a "Sun Productions, LLC", a non-existent entity, as a purported producer of the Series.

65. Defendants had actual knowledge of the wrongfulness of their conduct and the high probability that such acts would cause injury and/or damage to DICKINSON.

66. Additionally, Defendants knew that such conduct would result in injury and/or damage to DICKINSON, and despite their knowledge, Defendants intentionally pursued their course of conduct, resulting in injury or damage to DICKINSON

67. Some or all of the uses of PLAINTIFF'S identity by DEFENDANTS were commercial speech, and not subject to any defense predicated on the nature of the use being a non-commercial use or non-commercial speech. Specifically, some or all of DEFENDANTS' speech was either core commercial speech in that it proposes a commercial transaction, or in the alternative was nonetheless commercial for purposes of false advertising law and PLAINTIFF'S claims herein, in that the communications were advertisements, made reference to a specific

product, and the speaker had an economic motivation for the communication, all within the meaning of *Bolger v. Youngs Drugs Products Corp.*, 463 U.S. 60 (1983) and its progeny.  Among other specific facts, PLAINTIFF is informed and believes and thereon alleges that DEFENDANTS specifically represent the Series as being a "documentary" or otherwise as being a non-scripted, "reality" program, because true stories have additional appeal to consumers and so-characterizing the programming to consumers makes consumers more likely to watch it (or DEFENDANTS so believe).  In addition, PLAINTIFF is informed and believes and thereon alleges that DEFENDANTS also specifically represent the Series as being a "documentary" or otherwise as being a non-scripted, "reality" program for the purpose of evading payments that might be required to third parties, including PLAINTIFF here, if the Series were recognized as scripted, and/or if events purporting to be "captured" spontaneously by DEFENDANTS in photographing the Series can create arguments for DEFENDANTS not to pay for goodwill or services, where DEFENDANTS would clearly otherwise be required to do so.

68.    DEFENDANTS engaged in all of the above conduct with actual malice within the meaning of *New York Times v. Sullivan*, 84 S.Ct. 710 (1964).

## SECOND CLAIM FOR RELIEF

### *False Advertising in Violation of 15 U.S.C. § 1125(a)(1)(B)*

### *against All Defendants*

69.    PLAINTIFF repeats, re-alleges and incorporates herein by reference each and every allegation set forth in all of the foregoing paragraphs, and each paragraph of this Complaint hereafter, as if set forth herein in full.

70.    To the extent any of the allegations or theories in this Second Claim for Relief are inconsistent with other allegations or theories plead in this Complaint, they are plead in the alternative.

71.    The Lanham Act's section 43(a) as codified in 15 U.S.C. section

1125(a)(1)(B) creates a civil cause of action against any person who uses in commerce any false or misleading representation of fact which in commercial advertising or promotion misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities.

72.     DEFENDANTS have made at least the following specific false advertising statements:

a.   "Call the Fashion Police: Janice Dickinson just stole Golnesa 'GG' Gharachedhagi's romper!" on or about June 28, 2017 in an "exclusive" article by Natalie Stone in PeopleTVWatch.  PLAINTIFF is informed and believes and thereon alleges that the statements in the Natalie Stone article were essentially and for all practical purposes placed in the article by DEFENDANTS, including through DEFENDANTS making the statements to Natalie Stone either orally or in a press release, for the specific purpose of generating commercial publicity for the episode and the Series, for the purpose of generating consumer interest in the episode and the Series.

b.   "You Got Jacked: Did a Stolen Sequin Romper Just Ignite Janice Dickinson's Latest Feud?" as the headline to the Natalie Stone article above.  PLAINTIFF is informed and believes and thereon alleges that the intent and meaning of the headline is that PLAINTIFF intentionally stole the sequin romper chosen by Gharachedhagi for the fashion show and that PLAINTIFF and Gharachedhagi became linked in controversy and/or an active feud as a result, when in reality none of that is even remotely true.

c.   The following statements in the Stone article:

i.   "Unfortunately for Gharachedaghi, the 62-year-old self-

proclaimed 'world's first supermodel' has decided she has rights to the romper and jumped into a photo shoot."

ii.  " 'You got jacked,'" says event head Eric."

iii.  "A visibly irritated Gharachedaghi presses: 'What's happening with that situation?'"

iv.  "Eric tries to smooth over the tension, Eric tells her, 'I'm finding you a better outfit.'"

v.  "But Gharachedaghi doesn't want another outfit and insists that Dickinson be the one who should change."

vi.  "'No, you can find that old ass bitch something else,' she says."

vii.  "'I thought this bitch died out with the Flintstones,' Gharachedaghi says later in a confessional. 'I don't even know how she's able to walk right now, let alone walk a runway, let alone walk the runway wearing that outfit I'm supposed to be wearing?!'"

d.  The Stone piece closes with a note that "*Shahs of Sunset* airs Sundays (8 p.m. ET) on Bravo," not a false statement, but which is relevant here, including because pursuant to custom and practice in the industry, that inclusion qualifies the Stone piece as a promotional piece for the Series for purposes of numerous legal rights issues in the industry, and is one indicator that DEFENDANTS participated with Stone in preparing the piece, and did so for the purpose of generating consumer transactions in the form of greater audience for the episode and the Series, and PLAINTIFF is informed and believes and thereon alleges that DEFENDANTS did so. This belief is also further supported by the labeling of the Stone story as "exclusive," tending to

- 24 -

COMPLAINT

1    mean provided to Stone by the DEFENDANTS.

2    e.  PLAINTIFF is informed and believes and thereon alleges that

3        DEFENDANTS also provided false statements and information and

4        photographs of PLAINTIFF to Paul Chavez at the Daily Mail for the

5        purpose of causing Chavez to write a publicity and promotional piece

6        about the episode and the Series that appeared on the Daily Mail

7        website on or about July 31, 2017.  PLAINTIFF is informed and

8        believes and thereon alleges that false statements in the Chavez piece

9        are attributable to DEFENDANTS, including without limitation the

10       following:

11       i.   "'You got jacked'": GG makes runway debut on Shahs Of

12            Sunset after Janice Dickinson swipes her shiny silver outfit"

13       ii.  "Golnesa 'GG' Gharachedaghi made her runway debut after

14            getting her outfit jacked by Janice Dickinson on Sunday's

15            episode of Shahs Of Sunset"

16       iii. "Erik picked a shiny silver romper for GG but Janice, 62,

17            scooped it up off a rack."

18

19       iv.  "Runway debut: Golnesa 'GG' Gharachedaghi made her

20            runway debut during Sunday's episode of Shahs Of Sunset after

21            having her outfit jacked by Janice Dickinson"

22       v.   "GG showed that she's changed her ways and instead of

23            erupting went with the flow as Erik picked her out a new

24            outfit."  PLAINTIFF is informed and believes and thereon

25            alleges that the meaning and intent and the way that the

26            audience and consumers understood this statement was to imply

27            that Gharachedaghi was in fact unaware of the pre-scripted

28            events pursuant to which DEFENDANTS would make it appear

COMPLAINT

1     through false manipulation that DICKINSON had "stolen"

2     Gharachedaghi's outfit, when in fact DICKINSON did not

3     select the outfit at all in any practical effect, and Gharachedaghi

4     was also in on the scheme and knew it was a sham on the

5     audience.  PLAINTIFF is further informed and believes and

6     thereon alleges that the meaning and intent of the statement and

7     the way that it was understood by consumers was to suggest a

8     relationship (including a potential feud) between Gharachedaghi

9     and PLAINTIFF, for the express purpose of the Series trading

10    off of PLAINTIFF'S famous mark and goodwill, when in fact

11    there was no relationship whatsoever between PLAINTIFF or

12    the Series or any of the Series actors.

13      vi.   "Took it: Janice took the shiny silver romper that had been

14          picked out for GG."

15     vii.   "Outfit swiped: GG had some harsh words for Janice after she

16          took her outfit."

17

18    viii.   "Romper drama: GG turned around after being told that Janice

19          was wearing her outfit."  ."  PLAINTIFF is informed and

20          believes and thereon alleges that the meaning and intent and the

21          way that the audience and consumers understood this statement

22          was to imply that Gharachedaghi was in fact unaware of the

23          pre-scripted events pursuant to which DEFENDANTS would

24          make it appear through false manipulation that DICKINSON

25          had "stolen" Gharachedaghi's outfit, when in fact DICKINSON

26          did not select the outfit at all in any practical effect, and

27          Gharachedaghi was also in on the scheme and knew it was a

28          sham on the audience.  PLAINTIFF is further informed and

1               believes and thereon alleges that the meaning and intent of the

2               statement and the way that it was understood by consumers was

3               to suggest a relationship (including a potential feud) between

4               Gharachedaghi and PLAINTIFF, for the express purpose of the

5               Series trading off of PLAINTIFF'S famous mark and goodwill,

6               when in fact there was no relationship whatsoever between

7               PLAINTIFF or the Series or any of the Series actors.

8     f.  PLAINTIFF is informed and believes and thereon alleges that similar

9         false promotional statements were caused by DEFENDANTS to be

10        made in a promotional piece that appeared on or about July 30, 2017

11        by Julian Cheatle on Monsters & Critics, available at

12        https://www.monstersandcritics.com/smallscreen/janice-dickinson-

13        branded-old-bitch-by-shahs-of-sunset-star-golnesa-gg-gharachedaghi/

14    g.  PLAINTIFF is informed and believes and thereon alleges that on or

15        around July 30, 2017, DEFENDANTS (specifically

16        NBCUNIVERSAL doing business as Bravo) posted the following

17        false or intentionally misleading statement on YouTube to promote the

18        Series: "Evidently she [DICKINSON] took the outfit GG was

19        supposed to wear on the runway, and GG is pissed."  PLAINTIFF is

20        informed and believes and thereon alleges that the meaning and intent

21        and the way that the audience and consumers understood this

22        statement was to imply that Gharachedaghi was in fact unaware of the

23        pre-scripted events pursuant to which DEFENDANTS would make it

24        appear through false manipulation that DICKINSON had "stolen"

25        Gharachedaghi's outfit, when in fact DICKINSON did not select the

26        outfit at all in any practical effect, and Gharachedaghi was also in on

27        the scheme and knew it was a sham on the audience.  PLAINTIFF is

28

further informed and believes and thereon alleges that the meaning and intent of the statement and the way that it was understood by consumers was to suggest a relationship (including a potential feud) between Gharachedaghi and PLAINTIFF, for the express purpose of the Series trading off of PLAINTIFF'S famous mark and goodwill, when in fact there was no relationship whatsoever between PLAINTIFF or the Series or any of the Series actors.

h. DEFENDANTS (with the possible exception of ROSETTE) all regularly make statements to the public and in advertising in commerce to the effect that the Series is a "reality" television show, with the intent, meaning and understanding by the audience and consumers that the Series is not scripted, but instead is a documentary Series portraying non-scripted events that happen to the family and friends featured on the Series, and portrays their actual spontaneous reactions to these events. PLAINTIFF is informed and believes and thereon alleges that these statements are false and in fact the Series is scripted.

i. For example, PLAINTIFF is informed and believes and thereon alleges that one of the initial press releases for the Series, which press release PLAINTIFF is informed and believes and thereon alleges was generated by at least defendants SEACREST ENTERPRISES and TRULY, for the purpose of generating consumer interest in the Series, read as follows:

> BRAVO LAUNCHES NEW DOCU-SERIES "SHAHS OF SUNSET" ON SUNDAY, MARCH 11 AT 10PM ET/PT

1           NEW YORK - January 23, 2012 - Bravo gives viewers a

2           never-before-seen look inside the captivating lives of six

3           young Persian-American friends in Los Angeles when

4           "Shahs of Sunset" premieres on Sunday, March 11th at

5           10PM ET/PT. Partnering for the first time with Ryan

6           Seacrest Productions, the network's latest docu-series

7           follows a group of friends who are trying to juggle their

8           active social lives and up-and-coming careers while

9           balancing the demands of their families and traditions.

10          These passionate socialites are fervent on the dating and

11          party scene, but seeking approval from their families they

12          face pressures to settle down and marry within the

13          community. From outings on Rodeo Drive to traditional

14          Persian feasts at home, this series celebrates the unique

15          lifestyle of a group of friends who have worked hard for

16          what they have and are not afraid to flaunt it. For more

17          information, visit www.BravoTV.com and follow us on

18          Twitter at https://twitter.com/BravoPR.

19      j.  The meaning and intent of such statements by DEFENDANTS (at

20          least DEFENDANTS SEACREST ENTERPRISES,

21          NBCUNIVERSAL and TRULY), and the understanding of such

22          statements by consumers, is that the Series is a documentary program

23          that is not scripted.  For instance, the Series is listed on Wikipedia as a

24          "reality television series," which PLAINTIFF is informed and believes

25          and thereon alleges is a characterization of the Series caused by the

26          false advertising and promotional statements of DEFENDANTS to

27          that effect: the Wikipedia citation to the description of the Series as a

28

1           "reality television series" is the above-mentioned press release (as it

2           appears on a particular website).  Similarly, and PLAINTIFF is

3           informed and believes and thereon alleges for the same reasons (due to

4           the false promotional and advertising statements of the

5           DEFENDANTS), IMDb characterizes the Series as a "documentary."

6       73.    DEFENDANTS are falsely advertising and promoting the Series as a

7 "reality" or unscripted Series, when in fact the Series is largely or entirely scripted.

8       74.    DEFENDANTS' advertising statements were false or misleading.

9       75.    DEFENDANTS' advertising statements deceived or had the capacity

10 to deceive consumers and indeed that was their purpose.

11       76.    DEFENDANTS' deception had a material effect on purchasing

12 decisions, including without limitation the false or misleading representations that

13 stars of the Series had interaction with PLAINTIFF or a controversy with

14 PLAINTIFF, when in fact they had no interactions with PLAINTIFF at all, and the

15 false or misleading representation that the Series is a "documentary" program or

16 "reality" or other non-fictional program, when in fact the Series is, PLAINTIFF is

17 informed and believes and thereon alleges, largely or entirely scripted.

18       77.    The Series is distributed on television and other media throughout the

19 country and affects interstate commerce.

20       78.    PLAINTIFF has been or is likely to be injured as a result of the false

21 advertising.  Among other injuries, PLAINTIFF lost at least the approximately

22 $75,000 or higher fee that PLAINTIFF would have charged and earned for an

23 appearance and association with the Series of anything approaching this magnitude.

24       79.    PLAINTIFF is within the zone of interests intended to be protected by

25 the false advertising protections of the Lanham Act's section 43(a), and her injuries

26 as alleged herein were proximately caused by the false advertising conduct of

27 DEFENDANTS, all within the meaning of these terms as articulated and

28 interpreted by the Supreme Court in *Lexmark International, Inc. v. Static Control*

1  *Components, Inc.,* 134 S.Ct. 1377 (2014).

2       80.    DEFENDANTS' conduct was and is commercial speech by a party in

3  the same business as is PLAINTIFF (including without limitation reality

4  television), and DEFENDANTS' speech was for the purpose of influencing

5  consumers to buy or otherwise patronize DEFENDANTS' goods or services, and

6  DEFENDANTS' false representations were disseminated sufficiently to the

7  relevant purchasing public to constitute advertising or promotion within the reality

8  television industry.

9       81.    As a direct and proximate result of Defendants' wrongful actions,

10 Plaintiff has suffered damages in an amount to be proven at trial, but in excess of

11 the jurisdictional minimum.

12      82.    Plaintiff further alleges upon information and belief that Defendants'

13 unauthorized use of DICKINSON'S likeness, image, and identity will continue

14 unless and until Defendants are enjoined.  Plaintiff has no adequate remedy at law

15 to prevent Defendants from continuing to wrongfully violate Plaintiff's rights, and

16 Plaintiff will suffer irreparable harm unless Defendants are enjoined from

17 continuing their wrongful conduct.

18      83.    Defendants ROSETTE and CANNON conspired to participate in the

19 above conduct without DICKINSON'S express written or oral consent for purposes

20 of trade or for other commercial or advertising purposes, and took actions intended

21 to further that conspiracy, such as, among other things:

22           a.  Deliberately omitting the fact that the Mister Triple X runway show

23               event would be filmed in connection with the Series;

24           b.  Deliberately contriving a controversy regarding the romper, and

25               furthering that controversy using reality television series actors from

26               the Series so as to falsely suggest DICKINSON'S consent and

27               knowledge of her appearance in the Series, and even interaction with

28               the Series;

c.  Intentionally and purposefully forging the Purported Release, or in the alternative, intentionally and purposefully causing DICKINSON to unknowingly execute the Purported Release, so as to allow the other producers and distributors of the Series to exploit DICKINSON'S celebrity without DICKINSON'S actual authorization or approval; and

d.  Deliberately contriving a "Sun Productions, LLC", a non-existent entity, as a purported producer of the Series.

84.  Defendants had actual knowledge of the wrongfulness of their conduct and the high probability that such acts would cause injury and/or damage to DICKINSON.

85.  Additionally, Defendants knew that such conduct would result in injury and/or damage to DICKINSON, and despite their knowledge, Defendants intentionally pursued their course of conduct, resulting in injury or damage to DICKINSON.

86.  Some or all of the uses of PLAINTIFF'S identity by DEFENDANTS were commercial speech, and not subject to any defense predicated on the nature of the use being a non-commercial use or non-commercial speech.  Specifically, some or all of DEFENDANTS' speech was either core commercial speech in that it proposes a commercial transaction, or in the alternative was nonetheless commercial for purposes of false advertising law and PLAINTIFF'S claims herein, in that the communications were advertisements, made reference to a specific product, and the speaker had an economic motivation for the communication, all within the meaning of *Bolger v. Youngs Drugs Products Corp.*, 463 U.S. 60 (1983) and its progeny.  Among other specific facts, PLAINTIFF is informed and believes and thereon alleges that DEFENDANTS specifically represent the Series as being a "documentary" or otherwise as being a non-scripted, "reality" program, because true stories have additional appeal to consumers and so-characterizing the

1 programming to consumers makes consumers more likely to watch it (or

2 DEFENDANTS so believe).  In addition, PLAINTIFF is informed and believes and

3 thereon alleges that DEFENDANTS also specifically represent the Series as being

4 a "documentary" or otherwise as being a non-scripted, "reality" program for the

5 purpose of evading payments that might be required to third parties, including

6 PLAINTIFF here, if the Series were recognized as scripted, and/or if events

7 purporting to be "captured" spontaneously by DEFENDANTS in photographing

8 the Series can create arguments for DEFENDANTS not to pay for goodwill or

9 services, where DEFENDANTS would clearly otherwise be required to do so.

10       87.    Under the facts and circumstances here, the public interest in avoiding

11 consumer confusion outweighs the public interest in free expression, including not

12 least because DEFENDANTS intentionally created both a product and promotions

13 and advertisements for a product that were intentionally designed to mislead

14 consumers.  DEFENDANTS intentionally conspired and executed a false

15 controversy of PLAINTIFF "stealing" an outfit from the Series star, when in fact

16 no such thing occurred and in truth there were no interactions between PLAINTIFF

17 and any persons appearing in the Series whatsoever.  The purpose of this

18 intentionally false and misleading conduct was and is in part to deceive consumers.

19 DEFENDANTS also intentionally and on an ongoing basis falsely characterize the

20 Series as a "documentary," or "reality" programming, when in fact it PLAINTIFF

21 is informed and believes and thereon alleges that the Series is largely or entirely

22 scripted.  The purpose of this intentionally false and misleading conduct was and is

23 in part to deceive consumers.

24       88.    DEFENDANTS engaged in all of the above conduct with actual

25 malice within the meaning of *New York Times v. Sullivan*, 84 S.Ct. 710 (1964).

26 ///

27 ///

28 ///

- 33 -
COMPLAINT

# THIRD CLAIM FOR RELIEF

### *Dilution in Violation of 15 U.S.C. § 1125(c) against All Defendants*

89.     PLAINTIFF repeats, re-alleges and incorporates herein by reference each and every allegation set forth in all of the foregoing paragraphs, and each paragraph of this Complaint hereafter, as if set forth herein in full.

90.     To the extent any of the allegations or theories in this Third Claim for Relief are inconsistent with other allegations or theories plead in this Complaint, they are plead in the alternative.

91.     Federal trademark law permits the owner of a famous mark that is distinctive to seek relief from a person using a mark or trade name in commerce that is likely to cause dilution by blurring or tarnishment of the famous mark.

92.     PLAINTIFF'S identity and celebrity is a famous and distinctive mark. PLAINTIFF is widely recognized, has had and continues to have an acclaimed career, and has enjoyed fame for decades in both the fashion and entertainment industries.

93.     DEFENDANTS made and are making commercial use of PLAINTIFF'S famous and distinctive mark in interstate commerce.

94.     DEFENDANTS' use began after PLAINTIFF'S mark became famous.

95.     DEFENDANTS have committed dilution by tarnishment of PLAINTIFF'S famous mark by linking or associating PLAINTIFF'S famous mark with products or services of shoddy quality (including in that the Series portrays itself as a "documentary" or "reality" Series when in fact it is largely or entirely scripted, and is thus a sham on consumers), and/or by damaging the reputation of PLAINTIFF'S mark, including by actively disparaging PLAINTIFF and deliberately and falsely casting PLAINTIFF essentially as an unprofessional bully.

96.     As a direct and proximate result of Defendants' wrongful actions, Plaintiff has suffered damages in an amount to be proven at trial, but in excess of the jurisdictional minimum.

97.     Plaintiff further alleges upon information and belief that Defendants' unauthorized use of DICKINSON'S likeness, image, and identity will continue unless and until Defendants are enjoined.  Plaintiff has no adequate remedy at law to prevent Defendants from continuing to wrongfully violate Plaintiff's rights, and Plaintiff will suffer irreparable harm unless Defendants are enjoined from continuing their wrongful conduct.

98.     Defendants ROSETTE and CANNON conspired to participate in the above conduct without DICKINSON'S express written or oral consent for purposes of trade or for other commercial or advertising purposes, and took actions intended to further that conspiracy, such as, among other things:

    a. Deliberately omitting the fact that the Mister Triple X runway show event would be filmed in connection with the Series;

    b. Deliberately contriving a controversy regarding the romper, and furthering that controversy using reality television series actors from the Series so as to falsely suggest DICKINSON'S consent and knowledge of her appearance in the Series, and even interaction with the Series;

    c. Intentionally and purposefully forging the Purported Release, or in the alternative, intentionally and purposefully causing DICKINSON to unknowingly execute the Purported Release, so as to allow the other producers and distributors of the Series to exploit DICKINSON'S celebrity without DICKINSON'S actual authorization or approval; and

    d.  Deliberately contriving a "Sun Productions, LLC", a non-existent entity, as a purported producer of the Series.

99.     Defendants had actual knowledge of the wrongfulness of their conduct and the high probability that such acts would cause injury and/or damage to DICKINSON.

1       100.   Additionally, Defendants knew that such conduct would result in

2  injury and/or damage to DICKINSON, and despite their knowledge, Defendants

3  intentionally pursued their course of conduct, resulting in injury or damage to

4  DICKINSON.

5       101.   Some or all of the uses of PLAINTIFF'S identity by DEFENDANTS

6  were commercial speech, and not subject to any defense predicated on the nature of

7  the use being a non-commercial use or non-commercial speech.  Specifically, some

8  or all of DEFENDANTS' speech was either core commercial speech in that it

9  proposes a commercial transaction, or in the alternative was nonetheless

10  commercial for purposes of false advertising law and PLAINTIFF'S claims herein,

11  in that the communications were advertisements, made reference to a specific

12  product, and the speaker had an economic motivation for the communication, all

13  within the meaning of *Bolger v. Youngs Drugs Products Corp.*, 463 U.S. 60 (1983)

14  and its progeny.  Among other specific facts, PLAINTIFF is informed and believes

15  and thereon alleges that DEFENDANTS specifically represent the Series as being a

16  "documentary" or otherwise as being a non-scripted, "reality" program, because

17  true stories have additional appeal to consumers and so-characterizing the

18  programming to consumers makes consumers more likely to watch it (or

19  DEFENDANTS so believe).  In addition, PLAINTIFF is informed and believes and

20  thereon alleges that DEFENDANTS also specifically represent the Series as being

21  a "documentary" or otherwise as being a non-scripted, "reality" program for the

22  purpose of evading payments that might be required to third parties, including

23  PLAINTIFF here, if the Series were recognized as scripted, and/or if events

24  purporting to be "captured" spontaneously by DEFENDANTS in photographing

25  the Series can create arguments for DEFENDANTS not to pay for goodwill or

26  services, where DEFENDANTS would clearly otherwise be required to do so.

27       102.   DEFENDANTS engaged in all of the above conduct with actual

28  malice within the meaning of *New York Times v. Sullivan*, 84 S.Ct. 710 (1964).

1

2     **FOURTH CLAIM FOR RELIEF**

3     *Violation of Cal. Business & Professions Code §§ 17200, et seq.,*

4     *Against All Defendants*

5     103.   PLAINTIFF repeats, re-alleges and incorporates herein by reference

6     each and every allegation set forth in paragraphs 1 through 19, 44 through 48 and

7     paragraph 50 above, as if set forth herein in full in this Fourth Claim for Relief.

8     104.   To the extent any of the allegations or theories in this Third Claim for

9     Relief are inconsistent with other allegations or theories plead in this Complaint,

10    they are plead in the alternative.

11    105.   Within the last four years, DEFENDANTS have committed an act or

12    acts or practice or practices of unfair competition, as defined by California

13    Business & Professions Code section 17200, by making and/or uttering a forged

14    release of PLAINTIFF'S claims and potential claims against DEFENDANTS,

15    including by causing and/or ratifying transmission and/or other utterance of the

16    forged release in interstate commerce, including over the Internet and by email.

17    106.   The above act or acts or practice or practices are criminally unlawful

18    in that they violate California Penal Code section 470 and 18 U.S.C. section 1343.

19    107.   DEFENDANTS' unlawful acts constitute a continuing threat to

20    PLAINTIFF and to members of the public and to public policy, including without

21    limitation because PLAINTIFF is informed and believes and thereon alleges that

22    DEFENDANTS intend to continue to assert the forged release as a defense to

23    PLAINTIFF'S claims, even though PLAINTIFF is informed and believes and

24    thereon allege that some or all of the DEFENDANTS know that the release is

25    forged.  Furthermore, PLAINTIFF is informed and believes and thereon alleges

26    that discovery may show that DEFENDANTS or some of them regularly engage in

27    the act or practice of generating forged releases, including when DEFENDANTS

28    ///

1   neglect or otherwise fail to obtain valid or authentic releases in the course of
2   production.

3       108.   PLAINTIFF and/or other members of the public have no other
4   adequate remedy at law.

5       109.   As a result of the aforementioned conduct, PLAINTIFF and/or other
6   members of the public have lost money or property or otherwise suffered injury in
7   fact.

8

9                          **Prayer for Relief**

10      WHEREFORE, Plaintiff prays judgment be entered in her favor and against
11  Defendants, and each of them, as follows:

12

13  First Claim for Relief (False Endorsement in Violation of 15 U.S.C. §
14  1125(a)(1)(A))

15      1.  For injunctive relief, including without limitation for an order mandating
16          that Defendants cease and further promotional or advertising use of
17          PLAINTIFF'S identity and celebrity; that Defendants place a corrective
18          notice or disclaimer on the Episode putting viewers on notice that the
19          portions of the Episode regarding any relationship between PLAINTIFF
20          and actors on the Series are false and misleading and that PLAINTIFF had
21          no relationship or interactions with the Series actors other than being at the
22          same event and specifically that PLAINTIFF did not "steal" anyone's
23          outfit; and an order mandating that Defendants cease to promote or
24          advertise the Series as a "reality" or "documentary" or "docu-series", and
25          instead be directed to engage in corrective advertising that the Series is in
26          fact scripted and not a documentary Series.

27      2.  For compensatory damages;

28      3.  Defendants' profits;

                            - 38 -

4.  Attorney fees;

5.  Costs of suit;

6.  Prejudgment Interest; and

7.  Such other and further relief as the Court may deem just and proper.

Second Claim for Relief (False Advertising in Violation of 15 U.S.C. § 1125(a)(1)(B))

8.  For injunctive relief, including without limitation for an order mandating that Defendants cease and further promotional or advertising use of PLAINTIFF'S identity and celebrity; that Defendants place a corrective notice or disclaimer on the Episode putting viewers on notice that the portions of the Episode regarding any relationship between PLAINTIFF and actors on the Series are false and misleading and that PLAINTIFF had no relationship or interactions with the Series actors other than being at the same event and specifically that PLAINTIFF did not "steal" anyone's outfit; and an order mandating that Defendants cease to promote or advertise the Series as a "reality" or "documentary" or "docu-series", and instead be directed to engage in corrective advertising that the Series is in fact scripted and not a documentary Series.

9.  For compensatory damages;

10. Defendants' profits;

11. Attorney fees;

12. Costs of suit;

13. Prejudgment Interest; and

14. Such other and further relief as the Court may deem just and proper.;

Third Claim for Relief (Dilution in Violation of 15 U.S.C. § 1125(c))

15. For injunctive relief, including without limitation for an order mandating that Defendants cease and further promotional or advertising use of PLAINTIFF'S identity and celebrity; that Defendants place a corrective

notice or disclaimer on the Episode putting viewers on notice that the portions of the Episode regarding any relationship between PLAINTIFF and actors on the Series are false and misleading and that PLAINTIFF had no relationship or interactions with the Series actors other than being at the same event and specifically that PLAINTIFF did not "steal" anyone's outfit; and an order mandating that Defendants cease to promote or advertise the Series as a "reality" or "documentary" or "docu-series", and instead be directed to engage in corrective advertising that the Series is in fact scripted and not a documentary Series.

16. For compensatory damages;

17. Defendants' profits;

18. Attorney fees;

19. Costs of suit;

20. Prejudgment Interest; and

21. Such other and further relief as the Court may deem just and proper.;

Fourth Claim for Relief (Violation of Cal. Business & Professions Code §§ 17200, *Et Seq.*)

22. For an order preliminarily and/or permanently enjoining DEFENDANTS from uttering the forged release, including without limitation as a defense to this action or to any other claims brought by PLAINTIFF against DEFENDANTS that purport to be covered by the forged release;

23. For an order that defendants CANNON, SEACREST ENTERPRISES, TRULY, and SUN PRODUCTIONS conduct an audit of the production releases purportedly entered into and/or obtained by any of them for the purpose of determining whether said defendants have made or uttered any other forged releases and report to the Court regarding said audit results;

24. For an order that DEFENDANTS provide to PLAINTIFF and/or PLAINTIFF'S representatives the original electronic version of the forged

release, including without limitation all associated metadata and other data, for PLAINTIFF'S forensic or other examination for the purpose of determining the precise identity of the forger and such other information as may be obtained from such examination;

25. For costs of suit incurred; and

26. For such other and further relief as the Court may deem just and proper.

DATED: March 29, 2018

ANDERSON YEH PC
Edward M. Anderson
Regina Yeh

_____

Attorneys for Plaintiff
JANICE DICKINSON

COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Fed. R. Civ. P. 38, Plaintiff JANICE DICKINSON hereby demands a trial by jury of all matters triable to a jury.

DATED: March 29, 2018    ANDERSON YEH PC
             Edward M. Anderson
             Regina Yeh

             _____
             Attorneys for Plaintiff
             JANICE DICKINSON

# EXHIBIT A

---------- Forwarded message ----------
From: **Tess Cannon**
Date: Wed, Sep 6, 2017 at 1:53 PM
Subject: Release from Shahs
To: janicedickinson

Just so you have this.


Sent from my iPhone


📄 **Dickinson.Janice_Fashion_10-11-16_APP.PDF**
   160K

# Appearance Release

APPEARANCE RELEASE FORM AND ARBITRATION PROVISION

THIS IS A LEGAL DOCUMENT AFFECTING YOUR RIGHTS AND
RESPONSIBILITIES PLEASE READ IT CAREFULLY BEFORE SIGNING

1. I hereby grant to Suns Productions, LLC ("Producer") the right to take motion
and still pictures of me and record my voice and any sounds made by me, and to
obtain other information about me, including but not limited to my name,
likeness, photograph, voice, dialogue, sounds, biographical information,
personal characteristics and other personal identification (collectively, the
"Footage and Materials"), and to use the Footage and Materials in and in
connection with the development, production, distribution and exploitation of the
television program currently entitled "Shahs of Sunset" (the "Program"), and any
other production, and in the advertisements, merchandising, publicity and
promotions for the Program, and any other production and for any entity that
may sponsor, advertise in or exhibit in any manner the Footage and Materials,
the Program or any other production (the "Advertisements"), and in the
exploitation of all allied, ancillary and subsidiary rights (including, without
limitation, remake, sequel, theatrical, television, digital, radio, publishing,
merchandising, soundtrack album and other similar rights). The Footage and
Materials, the Program, and the Advertisements may be exploited throughout the
universe at any time, in perpetuity, in any and all media now known and
hereafter devised, without any monetary compensation to me whatsoever. The
rights granted herein shall also include the right to edit, delete, dub and
fictionalize the Footage and Materials, the Program, and the Advertisements as
Producer sees fit in Producer's sole discretion.

2. The Footage and Materials shall also include any and all material that I may
create, write, provide or contribute to in connection with the Program at any time,
including, without limitation, personal journals, photographs, webisodes, vlogs,
blogs, video diaries, e-mails and text/picture messages. Producer shall be the
sole and exclusive owner of all rights (including, without limitation, copyrights) in
and to the Footage and Materials. Any and all such Footage and Materials shall
be deemed "works made for hire" specially ordered as part of a motion picture or
other audio-visual work, and I waive the exercise of any "moral rights," "droit
moral," and any analogous rights which I have. To the extent I retain any interest
in the Footage and Materials, I hereby grant and assign to Producer all rights of
any nature in and to all such Footage and Materials.

3. I represent and warrant the following: (a) I am not currently, and during one (1)
year from today do not intend to be, a candidate for any public office; (b) my
appearance in the Program is not a performance and is not employment and is
not subject to any union or guild collective bargaining agreement, and does not
entitle me to wages, salary, corporate benefits, unemployment or workers'
compensation benefits, or other compensation under any such collective
bargaining agreement or otherwise; and (c) I will follow and obey all local, city,
state and federal laws. Without in any way limiting the foregoing, I will not
threaten, intimidate, injure or damage any person or property and shall refrain
from use of violence at all times.

4. Producer has no obligation to me whatsoever. Without in any way limiting the
foregoing, I acknowledge and agree that Producer is under no obligation to use
the Footage and Materials. I understand that it may be a federal offense, unless
disclosed to Producer prior to exhibition, if any, to do any of the following: (a)
give or agree to give any member of the production staff and anyone associated
in any manner with the Program or any representative of Producer any portion of
my compensation or anything else of value to arrange my appearance in the
Program or the Advertisements, or (b) accept or agree to accept anything of
value to promote any product, service or venture on the air or to use any
prepared material containing such a promotion. I represent and warrant that I
gave nothing of value nor did I agree to give anything of value to anyone so I
could be in the Program or the Advertisements. I know that Producer does not
permit it and that it may be a federal offense not to tell Producer if I had. I shall
notify Producer and the network on which the Program will air immediately if any
person attempts or has attempted to induce me to do anything in violation of the
foregoing or which is in any way dishonest.

5. I understand that I will not be paid any compensation for giving Producer the
rights listed in this Agreement, or for Producer's exercise of any and all of the

# Janice Dickenson



## Photographer/Filmmaker and Shoot Information
Name: Shahs
Signature:

Date Signed (m/d/y): 10/11/2016
Shoot Date (m/d/y): 10/11/2016
Shoot Name/Ref: Beverly Hills Hilton

## Model Information
Name: Janice Dickenson
Date of Birth (m/d/y): Adult
Gender: Unspecified
Email: 222
Signature:

Date Signed (m/d/y): 10/11/2016

The signatures on this release were captured digitally on a mobile device.
Release ID: 00172

rights listed in this Agreement. I hereby waive any and all rights I may have to any such compensation. I acknowledge and agree that a significant element of the consideration I am receiving under this Agreement is the opportunity for publicity that I will receive if Producer includes me or the Footage and Materials, in the Program or in the Advertisements. I know Producer will incur significant costs and

expenses in reliance upon this Agreement, so I will not attempt to cancel it or to revoke any of the rights granted to Producer herein. I acknowledge that I am a volunteer and that I shall not be deemed to be an employee of Producer, nor shall I be entitled to the benefits provided by Producer to its employees. To the extent that I receive anything of value in connection with the Program, including but not limited to goods and services, I shall be responsible for all taxes and other obligations that are or may become due from me.

6. I agree not to make any commercial or any other use of the fact that I appeared in the Program or that Producer used the Footage and Materials in the Program. I further agree that without the prior approval of one or more television networks or cable platforms of NBCUniversal Media, LLC ("Network") in each instance, I shall not discuss the Program or my participation in the Program with any third party, except that I may make incidental, non- derogatory mention that I participated in the Program (i.e., "I participated in the program Shahs of Sunset!") only after the earlier of the exhibition of the episode(s) in which I appear or the public announcement by Network of my participation in the Program.

7. RELEASE, AGREEMENT NOT TO SUE AND INDEMNITY. To the maximum extent permitted by law, I, for myself and on behalf of my heirs, executors, agents, successors or assigns, hereby release, hold harmless, and forever discharge Producer, NBCUniversal Media, LLC, Network, and any station or network that exhibits the Program, and each of their respective parent, subsidiary, related and affiliated entities, licensees, successors, assigns, sponsors and advertisers of each of the foregoing, and each of their respective officers, directors, principals, executives, on-air talent, agents, contractors, partners, shareholders, representatives and employees (the "Released Parties"), from any and all claims, actions, damages, losses, liabilities, costs, expenses, injuries or causes of action whatsoever that in any way are caused by, arise out of or result from this Agreement, my appearance in the Footage and Materials, the Program, or in the Advertisements, the creation of the Footage and Materials, or the broadcast or other exhibition of the Program, the Footage and Materials, or the Advertisements, on any legal theory whatsoever (including, but not limited to, personal injury, rights of privacy and publicity, defamation, or false light), regardless of whether caused by the negligence or willful misconduct of the Released Parties (collectively, the "Released Claims"). To the maximum extent permitted by law, I agree that I will never sue the Released Parties or anyone else because I
do not like the manner in which Producer took or used the Footage and Materials or for any cause of action based on any of the Released Claims. I will defend, indemnify and hold the Released Parties harmless from any and all such claims, actions, damages, losses, liabilities, costs, expenses, injuries or causes of action, as well as all those that in any way are caused by, arise out of or result from any breach or alleged breach by me of any of the representations or warranties made by me in this Agreement.

8. TO THE MAXIMUM EXTENT PERMITTED BY LAW, I WAIVE ANY AND ALL RIGHTS I MAY HAVE UNDER SECTION 1542 OF THE CIVIL CODE OF CALIFORNIA, AND EVERY LIKE PROVISION IN ANY FOREIGN JURISDICTION. SECTION 1542 PROVIDES AS FOLLOWS:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.]

9. MEDIATION & ARBITRATION. The parties agree that if any controversy or claim arising out of or relating to this Agreement cannot be settled through direct discussions, they shall endeavor first to settle the controversy or claim by a mediation administered by JAMS under its applicable rules. IF THE DISPUTE IS NOT OTHERWISE RESOLVED THROUGH DIRECT DISCUSSIONS OR MEDIATION, THE PARTIES AGREE THAT THE CONTROVERSY OR CLAIM, INCLUDING THE SCOPE OR APPLICABILITY OF THIS AGREEMENT TO ARBITRATE, SHALL THEN BE RESOLVED BY FINAL AND BINDING CONFIDENTIAL ARBITRATION ADMINISTERED BY JAMS IN ACCORDANCE WITH ITS STREAMLINED ARBITRATION RULES AND PROCEDURES OR SUBSEQUENT VERSIONS THEREOF (THE "JAMS RULES"), INCLUDING, WITHOUT LIMITATION, TO THE MAXIMUM EXTENT PERMITTED BY LAW, THE RULE PROVIDING THAT EACH PARTY SHALL PAY PRO RATA ITS SHARE OF JAMS FEES AND EXPENSES). THE JAMS RULES ARE AVAILABLE AT WWW.JAMSADR.COM. THE JAMS RULES FOR SELECTION OF ARBITRATORS SHALL BE

FOLLOWED, EXCEPT THAT THE ARBITRATOR SHALL BE (i) AN EXPERIENCED ARBITRATOR, WHO IS EXPERIENCED IN THE ENTERTAINMENT INDUSTRY, AND LICENSED TO PRACTICE LAW IN NEW YORK, OR (ii) A RETIRED JUDGE. ALL PROCEEDINGS BROUGHT PURSUANT TO THIS PARAGRAPH WILL BE CONDUCTED IN THE NEW YORK COUNTY. UPON THE CONCLUSION OF ANY ARBITRATION PROCEEDINGS, THE ARBITRATOR SHALL RENDER FINDINGS OF FACT AND CONCLUSIONS OF LAW AND A WRITTEN OPINION SETTING FORTH THE BASIS AND REASONS FOR ANY DECISION REACHED AND SHALL DELIVER SUCH DOCUMENTS TO EACH PARTY TO THE DISPUTE. THE PARTIES AGREE THAT, TO THE MAXIMUM EXTENT PERMITTED BY LAW, SUBJECT TO THE REMAINDER OF THIS PARAGRAPH, THE DAMAGES RECOVERABLE BY THE PARTIES SHALL BE LIMITED TO ACTUAL DAMAGES, AND SUCH PARTIES WAIVE THE RIGHT TO SEEK PUNITIVE OR EXEMPLARY DAMAGES. THE ARBITRATOR SHALL NOT HAVE THE AUTHORITY TO GRANT ANY REMEDIES THE PARTIES TO ANY DISPUTE HAVE WAIVED
HEREIN. FURTHER, I AGREE THAT GIVEN THE UNIQUE NATURE OF THE ENTERTAINMENT INDUSTRY, AND THE IRREPARABLE DAMAGE TO PRODUCER, NETWORK AND THEIR LICENSEES THAT WOULD RESULT FROM DELAYING OR PREVENTING THE EXHIBITION OF ANY PROGRAM PRODUCED HEREUNDER, I MAY NOT SEEK OR OBTAIN ANY INJUNCTIVE RELIEF THAT WOULD PREVENT ANY SUCH PARTIES FROM EXHIBITING, MARKETING, OR OTHERWISE EXPLOITING ANY PROGRAM PRODUCED HEREUNDER, OR OTHERWISE GRANTING ANY THIRD PARTY THE RIGHT TO DO ANY OF THE FOREGOING. NOTWITHSTANDING THE FOREGOING, TO THE EXTENT REQUIRED BY LAW, THE PARTIES AGREE THAT WITH RESPECT TO THE ARBITRATION OF ANY FEDERAL OR STATE CLAIM I BRING THAT ARISES FROM UNWAIVABLE PUBLIC RIGHTS, WHETHER STATUTORY OR NONSTATUTORY, THE FOLLOWING SHALL APPLY: THE ARBITRATOR MAY AWARD ANY REMEDY THAT WOULD HAVE BEEN AVAILABLE IN COURT; THE PARTIES SHALL BE PERMITTED DISCOVERY ADEQUATE TO SECURE THE NECESSARY INFORMATION TO PRESENT SUCH CLAIM OR DEFEND AGAINST SUCH CLAIM; AND PRODUCER SHALL PAY ALL TYPES OF COSTS THAT ARE UNIQUE TO ARBITRATION.

10. This Agreement shall be interpreted under the internal, substantive law of the State of New York without regard to the conflicts of law provisions thereof. To the extent that the arbitration provisions of this Agreement are not enforced or court proceedings are otherwise required, commenced or maintained, the parties submit to the in personam jurisdiction of the Supreme Court of the State of New York located in New York County and the United States District Court for the Southern District of New York, and waive any objections that they may have as to jurisdiction or venue in any such courts.

11. As used herein, "Producer" shall include Producer, its licensees, successors and assigns, and each of their respective parents, subsidiaries, and affiliates, and each of their respective officers, directors, shareholders, employees, agents, representatives, successors, licensees and assigns. I agree that Producer may license, assign, and otherwise transfer this Agreement and all rights granted by me to Producer under this Agreement to any person or entity.

12. This is the complete and binding agreement between Producer and me, and it supersedes all prior understandings and communications, both oral and written, with respect to its subject matter. The illegality, invalidity or unenforceability of any provision of this Agreement shall in no way affect the validity or enforceability of any of the remainder of this Agreement, which shall be enforced to the maximum extent permitted by law. This Agreement cannot be terminated, rescinded or amended, except by a written agreement signed by both Producer and me. This Agreement may be executed by original, facsimile or electronic signature. Any signed copy of this Agreement delivered by facsimile or electronic transmission shall for all purposes be treated as if it had been delivered containing my original signature, and shall be binding upon me in the same manner as though an original signed copy had been delivered.

I UNDERSTAND THAT I AM GIVING UP CERTAIN LEGAL RIGHTS UNDER THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, MY RIGHT TO FILE A LAWSUIT IN COURT WITH RESPECT TO ANY CLAIM ARISING IN CONNECTION WITH THIS AGREEMENT.

Signature:                                   Date:                            Phone:

Print Name:                        Date of Birth*:

Address:
∗ For verification purposes only pursuant to 18 U.S.C. §§ 2256 et seq.

If participant is under eighteen years of age: I represent and warrant that I am the parent or guardian of the minor whose name appears above. I acknowledge that I have read the foregoing Agreement and am familiar with each and all of the terms contained therein, I am satisfied that the Agreement is fair and equitable, and I hereby give my express consent to its execution by my child/ward and will not revoke my consent at any time. I hereby release the Released Parties (as defined above) from any claims and causes of action I may have against them of any nature whatsoever. I hereby fully and unconditionally guarantee the performance of my child's/ward's obligations and the grant of rights in and to the results and proceeds of my child's/ward's activities as set forth above.

Signature of Parent or Guardian:                              Date:

Print Name:                        Phone:

# EXHIBIT B

1988) or any similar laws of any jurisdiction.  The Contributor hereby enters into the same warranties, undertakings and representations given by the Lender in the Agreement as if they were given on behalf of the Contributor personally.

Signed by
JANICE DICKINSON

6-7-17