# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 18-2544-GW(JPRx) | Date | October 1, 2018 |
|---|---|---|---|
| Title | *Janice Dickinson v. Ryan Seacrest Enterprises, Inc., et al.* | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE |
|---|---|

| Javier Gonzalez | Katie Thibodeaux | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Edward M. Anderson | Wook Hwang |
| | Edward K. Lee |

**PROCEEDINGS:     DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT [36]**

The Court's Tentative Ruling is circulated and attached hereto. Court hears oral argument. For reasons stated on the record, Defendants' Motion is TAKEN UNDER SUBMISSION. Court to issue ruling.

                                                                    :     30

Initials of Preparer     JG

***Dickinson v. Ryan Seacrest Enterprises, Inc.***; Case No. 2:18-cv-02544-GW-(JPRx))
Tentative Ruling on Defendants' Motion to Dismiss Plaintiff's First Amended Complaint

## I. Background

### A. Factual Background

Plaintiff Janice Dickinson ("Dickinson" or "Plaintiff") sues Ryan Seacrest Enterprises Inc.; Truly Original, LLC; Sun Productions, LLC; Tess Cannon; NBC Universal Media, LLC; Erik Rosette ("Rosette") aka Mister Triple X; Ryan Seacrest Productions, LLC; Suns Productions LLC; and Does 3-20 (collectively, "Defendants")[1] for: (1) false endorsement in violation of 15 U.S.C. § 1125(a)(1)(A); (2) false advertising in violation of 15 U.S.C. § 1125(a)(1)(B); (3) dilution in violation of 15 U.S.C. § 1125(c); and (4) violation of California Business & Professions Code §§ 17200 (the "UCL"), *et seq.   See generally* First Amended Complaint ("FAC"), Docket No. 28.

The FAC alleges the following:

### 1. Plaintiff's Background

Plaintiff is a "world-famous" and "indeed legendary supermodel," who makes appearances in the beauty, fashion, and entertainment industries.  *See* FAC ¶ 21.  In the past, Plaintiff has designated representatives to enter into agreements to authorize the use of her "appearance and celebrity," including in television.  *See id.*  Plaintiff has been a producer, judge, contestant, and/or guest star in the following reality television series:  *America's Next Top Model*, *The Janice Dickinson Agency*, *I'm a Celebrity . . . Get Me Out of Here!*, *Celebrity Rehab with Dr. Drew,* and *Celebrity Big Brother*.  *See id.* ¶ 22.  Plaintiff attends charity runway shows and photoshoots without a fee, but does not appear on reality television shows pro bono.  *See id.* ¶ 23.  She does so as part of building goodwill in her mark and brand.  *See id.*

### 2. Plaintiff's Work for Rosette of Los Angeles Fashion Week

Plaintiff has known "Rosette," a designer and founder of Art Hearts Fashion that organizes Los Angeles Fashion Week and other events, for many years.  *See id.* ¶ 24. Plaintiff appeared as a runway model pro bono during Los Angeles Fashion Week for Rosette each year between 2010 and 2016.  *See id.* ¶ 25.  Rosette knew that Plaintiff would not appear pro bono as

---

[1] On July 9, 2018, Plaintiff filed a notice of voluntary dismissal without prejudice as to Ryan Seacrest Enterprises, Inc. and Sun Productions, LLC.  *See* Plaintiff Janice Dickinson's Notice of Voluntary Dismissal Without Prejudice of Defendants Ryan Seacrest Enterprises, Inc. and Sun Productions, LLC, Docket No. 33.

a runway model if Rosette were planning to exploit Plaintiff's "celebrity" without her consent to facilitate a reality television show.  *See id.*

In Fall 2016, Plaintiff agreed to appear in Rosette's runway show under his "Mister Triple X" label," with the show scheduled for October 2016 during Los Angeles Fashion Week. *See id.* ¶ 26.  Plaintiff understood that her appearance would go to supporting the Mister Triple X label and young emerging artists and designers within the Art Hearts Fashion organization, rather than to promoting, marketing, or advertising a reality television series.  *See id.* ¶ 27.  Plaintiff is informed and believes that Rosette, without her knowledge, contracted with or otherwise agreed and arranged with one or more Defendants to exploit Plaintiff's appearance on an episode of the Shahs of Sunset Series ("Series").  *See id.* ¶ 28.  If Plaintiff had known about these arrangements she would not have appeared pro bono, or necessarily at all.  *See id.* ¶ 29.  Plaintiff would not have agreed to participate in a narrative in the Series portraying her as unprofessional.  *See id.* ¶ 31.

Plaintiff alleges that Rosette, along with one or more agents for Seacrest Productions, Truly Cannon, and/or Suns Productions agreed and conspired to script an episode of the Series ("the Episode") to include a false controversy in which they would make it appear that Plaintiff intentionally stole or bullied her way into wearing an outfit that had supposedly been previously selected for Golnesa Gharachedaghi ("Gharachedaghi"), a lead character on the Series.  *See id.* ¶ 32.  This group conspired and scripted the Episode with the intent of keeping the plan and script secret from Plaintiff, which they ultimately did.  *See id.* ¶ 33.  In addition, the group did so to market, advertise, and promote the Series by improperly trading off the goodwill, celebrity, and fame of Plaintiff, without paying any fee.  *See id.*

### 3. The Fall 2016 Mister Triple X Show at Los Angeles Fashion Week

On or around October 11, 2016, Plaintiff participated in the Mister Triple X runway show at the Beverly Hilton during Los Angeles Fashion Week.  *See id.* ¶ 36.  In the backstage dressing area, a member of the Arts Hearts Fashion staff, with Rosette's knowledge and approval, directed Plaintiff to a rack of Mister Triple X label clothing.  *See id.* ¶ 37.  The staff member then offered Plaintiff two choices of outfits from the rack, one of which was a shiny silver romper that the staff member strongly encouraged Plaintiff to choose to effectuate the pre-scripted conspiracy.  *See id.*  Rosette and the staff member intentionally manipulated Plaintiff into choosing the romper.  *See id.*

2

Prior to the runway show, Rosette arranged and directed Plaintiff to participate in a photoshoot wearing the romper in the backstage area, which was part of the pre-scripted conspiracy kept from Plaintiff. *See id.* ¶ 38. Plaintiff then opened and closed the runway show wearing the romper. *See id.* At no time did Plaintiff sign any contract or release for her appearance on the Series or in the Mister Triple X runway show. *See id.* ¶ 39. Prior to the airing of the Episode, Plaintiff was unaware that the Series was producing the Episode during Los Angeles Fashion Week and she was similarly unaware of the pre-scripted conspiracy. *See id.*

### 4. Plaintiff Learning of Her Appearance on the Episode

On or around August 2017, Plaintiff learned that her appearance in Fall 2016 at the Mister Triple X runway show was exploited in the Episode, first aired on July 30, 2017 on Bravo TV. *See id.* ¶ 41. The Episode shows Plaintiff walking the runway during the Mister Triple X show, Plaintiff preparing backstage, and Plaintiff posing at the backstage photoshoot wearing the romper. *See id.* ¶ 42. It includes the name, image, and likeness of Plaintiff. *See id.* ¶ 47. Those scenes were filmed without Plaintiff's knowledge or consent and were intentionally manipulated to feature Plaintiff prominently in the Episode and accompanying promotion, marketing, and advertising to trade off of Plaintiff's fame and good will. *See id.* ¶ 42. Those scenes were used to intentionally create a false narrative that Plaintiff "stole" or "jacked" the romper Rosette promised for Gharachedaghi, one of the lead characters in the Series. *See id.* ¶ 43.

In the Episode, Plaintiff wears the romper and Gharachedaghi looks at Plaintiff and tells Rosette "[w]hat's going on with that outfit," to which Rosette replies "[y]ou got jacked." *See id.* ¶ 44. Gharachedaghi then exhibits purported outrage at how Plaintiff stole the romper, when in fact Plaintiff had no knowledge of Gharachedaghi and the outfit issue. *See id.* The Episode then shows Gharachedaghi reacting to Plaintiff's seemingly selfish conduct that was engineered by Rosette and his staff. *See id.* ¶ 45. This false controversy was preconceived, scripted, and orchestrated by Rosette in coordination with at least one of Defendants to leverage Plaintiff's celebrity without payment. *See id.* ¶ 46. The false controversy, portrayed as true, also appeared in a YouTube video and various online articles. *See id.* ¶ 47.

### 5. Plaintiff's Confrontation with Defendants and the Forging of the Release

After becoming aware of the Episode, Plaintiff and/or her representatives communicated with producers of the Series about how the Episode came to pass. *See id.* ¶ 48. The producers claimed Plaintiff had authorized the above in a written signed release. *See id.* Plaintiff did not

sign such a release, and it took weeks for the producers to produce the release.  *See id.* ¶¶ 48-49.

On or around September 6, 2017, Plaintiff received an email from Cannon ("Cannon Email") attaching a document that purports to be a printout of an electronic release signed by Plaintiff on a mobile device ("Purported Release").  *See id.* ¶ 50; FAC Ex. A (copy of the Cannon Email and the Purported Release), Docket No. 28 at CM/ECF pgs. 48-52.  The Purported Release reflects a release between Janice "Dickenson" (spelling incorrect in Purported Release) and Suns Productions, LLC, in which Plaintiff released Suns Productions, NBC Universal, and all their affiliates from a broad range of liability for Plaintiff's appearance in the Series.  *See id.*

Plaintiff never signed the Purported Release and the signature does not match Plaintiff's signature.  *See* FAC ¶ 51.  The signature on the Purported Release is different from a sample of Plaintiff's signatures.  *See id.*; FAC Ex. B (sample of Plaintiff's signature), Docket No. 28 at CM/ECF pgs. 53-54.  As such, upon information and belief at least some of Defendants forged Plaintiff's signature on the Purported Release.  *See* FAC ¶ 51.  Cannon presented the forged release to Plaintiff to defraud her.  *See id.*  Plaintiff requested the electronic original of the Purported Release to conduct a forensic examination, but Defendants have refused.  *See id.* ¶¶ 52-53.  Defendants have made no denial as to forging the Purported Release.  *See id.* ¶ 53.

**B. Procedural Background**

Defendants filed a motion to dismiss the FAC.  *See* Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss Plaintiff's First Amended Complaint ("MTD"), Docket No. 38.[2]  In response, Plaintiff filed an opposition to the MTD.  *See* Plaintiff's

---

[2] Defendants also submitted a request for judicial notice.  *See* Request for Judicial Notice in Support of Defendants' Motion to Dismiss Plaintiff's First Amended Complaint ("Defs.' RJN"), Docket No. 40.  Defendants request that the Court take judicial notice of the Episode, the three articles referenced in the FAC, the YouTube page referenced in the FAC, and the press release referenced in the FAC.  *See id.*; Declaration of Wook Hwang in Support of Defendants' Motion to Dismiss ("Hwang Decl.") Exs. 1-6, Docket No. 39.  The Court would find those materials suitable for judicial notice because they are incorporated by reference in the FAC.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007) (noting that "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference . . . ."); *see also Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010) (noting that the Ninth Circuit has "extended the doctrine of incorporation by reference to consider documents in situations where the complaint necessarily relies upon a document or the contents of the document are alleged in a complaint, the document's authenticity is not in question and there are no disputed issues as to the document's relevance.").

On a separate note, Plaintiff lodges objections to evidence submitted along with Defendants' MTD.  *See generally* Plaintiff's Evidentiary Objections to Evidence Submitted in Connection with Defendants' Motion to Dismiss Plaintiff's First Amended Complaint ("Pl.'s Objections"), Docket No. 42.  Plaintiff objects to the inclusion of examples of her signature on page 3 footnote 1 of the MTD and other examples of Plaintiff's signature including

Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss First Amended Complaint ("Opp'n"), Docket No. 41.   Defendants filed a reply.   *See* Reply Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss Plaintiff's First Amended Complaint ("Reply"), Docket No. 45.

## II. <u>Legal Standard</u>

Typically, plaintiffs in federal court need only give "a short and plain statement of the claim showing [entitlement] to relief." Fed. R. Civ. P. 8(a)(2).   Under Rule 12(b)(6), a defendant may move to dismiss for failure to state a claim upon which relief can be granted.   Fed. R. Civ. P. 12(b)(6).   A complaint may be dismissed for failure to state a claim for one of two reasons: (1) lack of a cognizable legal theory; or (2) insufficient facts under a cognizable legal theory.   *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008) ("Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory.").

In deciding a 12(b)(6) motion, a court "may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice."   *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007); *see also Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) (indicating that a court may consider a document "on which the complaint 'necessarily relies'" if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion").   The court must construe the complaint in the light most favorable to the plaintiff, accept all allegations of material fact as true, and draw all reasonable inferences from well-pleaded factual allegations.   *Gompper v. VISX, Inc.*, 298 F.3d 893, 896 (9th Cir. 2002); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001), *amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001); *Cahill v. Liberty Mutual Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996).   The court is not required to accept as true legal conclusions couched as factual allegations.   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).   Where a plaintiff facing a 12(b)(6) motion has pled "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," the motion should be denied.   *Id.*; *Sylvia*

---

Defendants' link to search results on eBay.  *See id.*  These samples do not come into play in the below analysis, and thus the Court need not at this time rule on that objection.

*Landfield Trust v. City of Los Angeles*, 729 F.3d 1189, 1191 (9th Cir. 2013).  But if "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not show[n] . . . the pleader is entitled to relief."  *Iqbal*, 556 U.S. at 679 (citations omitted).

## III. <u>Analysis</u>

### A. First, Second, and Third Causes of Action: Lanham Act Claims

Defendants analyze the first, second, and third Lanham Act claims[3] for relief together, arguing that the First Amendment test in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989) applies and bars those claims.  *See* MTD at 10-17.  In response, Plaintiff argues that the First Amendment does not protect knowingly false speech made with actual malice.  *See* Opp'n at 9-10.  Plaintiff argues that certain parts of Defendants' speech constitutes commercial speech because some or all of the false endorsement claim targets the promotion, marketing, and advertising of the Episode rather than the Episode itself.  *See id.* at 11-15.  Plaintiff predominantly makes these arguments as to the first cause of action for false endorsement, though to some degree relates them to the other two Lanham Act causes of action, including the dilution and false advertising claims.  *See id.*

As to Defendants' use of Plaintiff's name, image, and likeness in the Episode, the Court examines whether the First Amendment shields Defendants from Lanham Act liability.  With expressive works, the Ninth Circuit "ha[s] adopted the Second Circuit's *Rogers* test to strike an appropriate balance between First Amendment interests in protecting artistic expression and the Lanham Act's purposes to secure trademark rights."  *Gordon v. Drape Creative, Inc.*, 897 F.3d 1184 (9th Cir. July 30, 2018) (citation omitted).  Under the *Rogers* test, "[a]n artistic work's use of a trademark that otherwise would violate the Lanham Act is not actionable unless [1] the [use of the mark] has no artistic relevance to the underlying work whatsoever, or, [2] if it has some artistic relevance, unless [it] explicitly misleads as to the source or the content of the work."  *E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1099 (9th Cir. 2008) (citation and internal quotation marks omitted).  Courts have applied this test to expressive works when there are trademark infringement, false endorsement, and false advertising claims arising under the Lanham Act.  *Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1241 (9th Cir. 2013) (applying

---

[3] Plaintiff's first claim for relief is for false endorsement, her second claim for relief is for false advertising, and her third claim for relief is for dilution.  *See* FAC ¶¶ 56-109.

*Rogers* test to false endorsement claim); *Rogers*, 875 F.2d 994 (involving false advertising claim under the Lanham Act).   "Although this test traditionally applies to uses of a trademark in the title of an artistic work, there is no principled reason why it ought not also apply to the use of a trademark in the *body of the work*." *E.S.S.*, 547 F.3d at 1099, (emphasis added).

### 1. First Prong of the *Rogers* Test

Here, the Court applies the *Rogers* test, at least to the extent the false advertising and false endorsement claims rest on Defendants' actions vis-à-vis the Episode.[4]   Under the first prong of the *Rogers* test, "only the use of a trademark with 'no artistic relevance to the underlying work whatsoever' does not merit First Amendment protection. In other words, the level of relevance merely must be above zero." *E.S.S.*, 547 F.3d at 1100 .   "A mark that has no meaning beyond its source-identifying function is more likely to be used in a way that has 'no artistic relevance to the underlying work whatsoever,' [citation] because the work may be 'merely borrow[ing] another's property to get attention,' [citation]." *Id.* at 1198 (quoting *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 902 (9th Cir. 2002) and citing *Dr. Seuss Ents., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1401 (9th Cir. 1997)).   Courts have held that the use of a celebrity's name and/or likeness was artistically relevant to expressive works that included that celebrity's name, image, and/or likeness.   *See Brown*, 724 F.3d at 1243-45, 1248 (holding that "the likeness of a great NFL player is artistically relevant to a video game that aims to recreate NFL games."); *ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 937 (6th Cir. 2003) (holding that "the presence of [Tiger] Woods's image in [a golf painting] does have artistic relevance to the underlying work.").

The Court would find that the inclusion of Plaintiff's likeness, image, and name in the Episode, even if included without her consent, bore artistic relevance above zero.   From the Court's review of the Episode, part of the Episode focused on the Los Angeles Fashion Show, and a significant sub-plot of the Episode included the narrative that Plaintiff stole the romper earmarked for Gharachedaghi.   *See generally* Hwang Decl. Ex. 1 (the Episode).   Because of Plaintiff's role in that narrative, false or not, the use of Plaintiff's name and likeness are artistically relevant to the Episode.   In addition, the Opposition does not seem to meaningfully dispute artistic relevance.   *See generally* Opp'n.

---

[4] It appears substantively undisputed that the Episode itself is an expressive work.   *See generally* MTD; Opp'n.

### 2. Second Prong of the *Rogers* Test

The *Rogers* test's second prong requires junior users to demonstrate that their work does not *explicitly* mislead as to that work's source or content. *Mattell*, 296 F.3d at 902. "It is well established that the use of a mark alone is not enough [for the plaintiff] to satisfy this prong of the *Rogers* test." *Brown*, 724 F.3d at 1245. As such, the question is "whether there was an 'explicit indication,' 'overt claim,' or 'explicit misstatement' that caused . . . consumer confusion." *Id.* (quoting *Rogers*, 875 F.2d at 1001). According to the Ninth Circuit, even if a party produces survey evidence demonstrating consumers believed that the trademark owner endorsed the allegedly infringing work, that would not be sufficient to support a claim of explicit misleading. *Id.* at 1245-46. "To be relevant, evidence must relate to the nature of the behavior of the identifying material's user, not the impact of the use." *Id.* at 1246. As an example, if a party produced evidence of "statements made in materials" accompanying the allegedly infringing work that explicitly misleads consumers as to the source of the work, that might be sufficient depending on the statements. *Id.* Ultimately, Courts "must ask . . . 'whether there was an explicit indication, overt claim, or explicit misstatement that caused such consumer confusion . . . . the use of a mark alone is not enough to satisfy this prong of the *Rogers* test . . . .'" *See Empire*, 875 F.3d at 1199.

The *Brown* case is particularly relevant in this instance. In *Brown*, a retired football player sued Electronic Arts in connection with its sale of popular football-related video games. *See* 724 F.3d at 1238-40. There, the plaintiff retired football player brought claims based on the use of his likeness in Electronic Arts' video games. *See id.* The Ninth Circuit found the plaintiff's claims barred by the First Amendment because the video games constituted expressive works, notwithstanding their commercial purpose, and because the use of the plaintiff's likeness was not explicitly misleading. *See id.* at 1245-48. The Ninth Circuit elaborated on the application of the misleading prong of the *Rogers* test, and noted the importance of that inquiry:

> It is key . . . that the creator must explicitly mislead consumers. "[T]he slight risk that . . . use of a celebrity's name might implicitly suggest endorsement or sponsorship to some people is outweighed by the danger of restricting artistic expression, and [in cases where there is no explicit misleading] the Lanham Act is not applicable." This second prong of the *Rogers* test "points directly at the purpose of trademark law, namely to avoid confusion in the marketplace by allowing a trademark owner to prevent others from duping consumers into buying a product they mistakenly believe is sponsored by the trademark owner." *We must ask "whether the [use of the plaintiff's likeness] would confuse [video game] players into thinking that [the plaintiff] is somehow behind [the*

> *games] or that [he] sponsors [Electronic Arts'] product," and whether there was an "explicit indication," "overt claim," or "explicit misstatement" that caused such consumer confusion . . . .*

*See id.* at 1245 (internal citations omitted, and emphasis added).  In determining that the plaintiff did not satisfy this prong, the Ninth Circuit held that the following was insufficient: the mere use of the plaintiff's likeness in the video games, a consumer data survey showing confusion, written materials accompanying the game that were true and did not explicitly mislead, changes made to the plaintiff's likeness in the video games, and certain comments by Electronic Arts officials. *See id.* at 1245-47.

Similarly to *Brown*, the mere use of Plaintiff's likeness, image, and name in the Episode is not enough to satisfy this prong.  The FAC does not adequately allege that the use of Plaintiff's name, image, and likeness "would confuse [consumers] into thinking that [Plaintiff] is somehow behind [the Episode] or that [Plaintiff] sponsors [Defendants'] product . . . there [is no] *explicit* indication, *overt* claim, or *explicit* misstatement that caused such consumer confusion." *Id.* at 1245 (emphasis added); *see generally* FAC.  Near the beginning of the Episode, the cast members, producers, and companies behind the Episode are listed, with Dickinson failing to appear on that list.  *See Stewart Surfboards, Inc v. Disney Book Grp., LLC*, No. CV 10-2982 GAF (SSX), 2011 WL 12877019, at *7 (C.D. Cal. May 11, 2011) (dismissing false endorsement, trademark infringement, and UCL claim for failure to meet the *Rogers* test's second prong and holding that the allegedly infringing Disney book, though containing plaintiff's trademark on a surfboard on the back cover, "does not say anything like 'Brought to You By Stewart Surfboards' or 'Presented by Stewart Surfboards,' nor does it indicate that it is a story about Stewart or his surfboards.  To the contrary, the book jacket and spine include [various Disney logos] . . . .").  Moreover, there is nothing to suggest that Plaintiff, who is portrayed as the nemesis in one scene of one episode in a reality television show, somehow endorsed or backed the Episode.  Though the Episode's allegedly false narrative portraying Plaintiff as "stealing" the romper may be unethical or violate some other law, that narrative does not sustain the *Rogers* explicitly misleading prong as to Plaintiff's Lanham Act claims.  Likewise, nothing in the allegedly false statements made outside the Episode satisfy this prong as to the Episode because they do not state that Plaintiff was behind Episode.  *See Brown*, 724 F.3d at 1246 (holding that the plaintiff in that case "need[ed] to prove that [Electronic Arts] explicitly misled consumers

about Brown's endorsement of the game, not that [Electronic Arts] used Brown's likeness in the game; nothing in [Electronic Arts'] promotion suggests that [Brown endorse[d] [Electronic Arts'] game."); *see also* FAC ¶¶ 44, 77.  Also, those outside statements, other than the YouTube page, were made beyond the control of the Defendants named *in this* action.[5]  *See id.*

Because of Plaintiff's failure to satisfy the second prong of the *Rogers* test,[6] the Court

---

[5] Though the Court tentatively concludes that there has been no explicit misleading for the above reasons, the Court would ask the parties to more thoroughly address at the hearing whether there is a *separate* inquiry that Plaintiff may satisfy as to explicit misleading regarding *content* rather than as to *source*.  Neither party extensively discusses *case law* addressing whether the second prong test is different for source misleading as opposed to content misleading.  The Ninth Circuit has named both source and content as part of the second prong test, in that the test requires that Plaintiff show that the use of a trademark or other identifying material "explicitly misleads as to the *source or the content* of the work."  *See Brown*, 724 F.3d at 1239 (internal quotation marks, citation omitted, emphasis added).  But, in application, the Ninth Circuit seems to conflate the two terms "source" and "content" and boils the explicit misleading test down to "whether the [use of the plaintiff's likeness] would confuse [consumers] into thinking that [the plaintiff] is somehow behind [the product] or that [he] sponsors [the defendant's] product, and whether there was an explicit indication, overt claim, or explicit misstatement that caused such consumer confusion . . . ."  *Brown*, 724 F.3d at 1245 (internal quotation marks and citations omitted); *see also E.S.S.*, 547 F.3d at 1100 (reiterating that the test is whether the defendant "explicitly misleads as to the source or the content of the work," but then applying that test with the question of "whether the Game would confuse its players into thinking that the Play Pen is somehow behind the Pig Pen or that it sponsors Rockstar's product.").  One relevant treatise iterates application of the test as "whether there is a likelihood of confusion or deception that the plaintiff *has produced or endorsed the defendant's work*."  6 McCarthy on Trademarks and Unfair Competition § 31:144.50 (5th ed.) (2018) (emphasis added).  If it is the case that the aforementioned relevant question from *E.S.S.* and *Brown* is the correct one for explicit misleading as to both source *and* content, then the Court's analysis in this tentative would not change and the fact that the narrative regarding Plaintiff is allegedly false would be of no moment.  The alleged falsity of the narrative (or the regurgitation of said narrative outside of the Episode) does not explicitly mislead as to who was behind the Episode, who sponsored it, or who produced it.

The Court notes, however, that it is possible that there may be some distinction between an inquiry into source and an inquiry into content, which would make the false narrative allegations potentially relevant.  In *Rogers*, the Second Circuit noted, at least in the context of confusing titles, that:

> [T]itles with at least minimal artistic relevance to the work may include explicit statements about the *content* of the work that are seriously misleading. For example, if the characters in the film in this case had published their memoirs under the title "The True Life Story of Ginger and Fred," and if the film-maker had then used that fictitious book title as the title of the film, the Lanham Act could be applicable to such an explicitly misleading description of content. But many titles with a celebrity's name make no explicit statement that the work is about that person in any direct sense; the relevance of the title may be oblique and may become clear only after viewing or reading the work. As to such titles, the consumer interest in avoiding deception is too slight to warrant application of the Lanham Act.

*Rogers*, 875 F.2d at 1000.  The Court would ask the parties to address this issue at the hearing; the disposition in this tentative hinges on Defendants prevailing on this point.

[6] The Court is baffled by Plaintiff's argument that *New York Times v. Sullivan*, 376 U.S. 254 (1964), somehow bars the application of the *Rogers* test here.  *See* Opp'n at 11-13.  The "actual malice" requirement in *Sullivan* generally relates to the balance between the First Amendment and claims for defamation.  *See Sullivan*, 376 U.S. at 279-81.  In the last decade, the Supreme Court explicitly warned against a broad expansion of the principles in *Sullivan*:

> The Government thus seeks to use this principle for a new purpose. It seeks to convert a rule that limits liability even in defamation cases where the law permits recovery for tortious wrongs into a rule that

would dismiss Plaintiff's false endorsement and false advertising claims derived in the Episode's use of Plaintiff's name, image, and likeness. *Brown*, 724 F.3d at 1241 (applying *Rogers* test to false endorsement claim); *Rogers*, 875 F.2d 994 (involving false advertising claim under the Lanham Act).   As to the dilution cause of action, the Ninth Circuit has not explicitly applied the *Rogers* test to trademark dilution, "but artistic trademark uses are protected from trademark dilution liability for similar reasons." *See Stewart Surfboards*, 2011 WL 12877019, at *8. Under 15 U.S.C. § 1125(c)(3)(C), trademark dilution is not actionable as to "[a]ny noncommercial use of a mark."   The Ninth Circuit has construed that section to cover "speech [that] is not '*purely commercial*' − that is [speech that] does more than propose a commercial transaction." *MCA Records*, 296 F.3d at 906 (emphasis added).   Such speech cannot form the basis of a dilution claim and is "entitled to full First Amendment protection." *See id.* at 906-07. As per the conclusion above, Plaintiff's name, image, and likeness bore artistic relevance to the Episode, and so the Court would find that the use of that name, image, and likeness in the Episode is similarly not purely commercial.   As such, the use of Plaintiff's name, image, and likeness in the Episode cannot form the basis of Plaintiff's trademark dilution claim. *See e.g.*, *Stewart Surfboards*, 2011 WL 12877019, at *8 (dismissing trademark dilution claim "[b]ecause, as explained above, Disney's use of the Stewart Surfboards trademark has some artistic relevance [and is therefore] not purely commercial.  It is therefore not actionable as trademark dilution.")[7]

---

expands liability in a different, far greater realm of discourse and expression. That inverts the rationale for the exception. The requirements of a knowing falsehood or reckless disregard for the truth as the condition for recovery in certain defamation cases exists to allow more speech, not less. A rule designed to tolerate certain speech ought not blossom to become a rationale for a rule restricting it.

*See United States v. Alvarez*, 567 U.S. 709, 719-20 32 S. Ct. 2537, 2545, 183 L. Ed. 2d 574 (2012).  The proper test with expressive works in the context of most Lanham Act claims is the *Rogers* test, as discussed above.

[7] To the extent that Plaintiff's Lanham Act claims derive from materials made *outside* of the Episode (FAC ¶¶ 47, 77), Plaintiff's claims would still fail.  Those third-party articles are written by *non-defendants* Natalie Stone, Paul Chavez, and Julian Cheatle; they predominantly relay the contents of the Episode; and they are news articles that the Court does not consider as actionable in this particular context.  The other outside material referenced in FAC ¶¶ 47, 77 is a YouTube video, titled "Shahs of Sunset: Did Janice Dickinson Just Steal GG's Look?! (Season 6, Episode 3) / Bravo," that simply includes the clip of the Episode featuring Plaintiff.  *See* Hwang Decl. Ex. 5.  For the same reasons that the claims derived in the Episode fail, so too would the claims fail to the extent they derive from this YouTube video.  The Court does not believe that the caption below the YouTube video changes this analysis. *See id.*

On a separate note, the Court need not address Defendants' nominative fair use argument because it would dismiss the Lanham Act claims for the reasons stated herein.  *See* MTD at 19-21.

**B. Fourth Cause of Action: UCL Claim**

In the FAC's fourth cause of action, Plaintiff alleges a UCL claim against Defendants based on the "unlawful" prong.  *See* FAC ¶¶ 110-16.  Plaintiff alleges this claim based on the Purported Release wherein Defendants allegedly forged Plaintiff's signature.  *See id.* ¶ 114.  Plaintiff also alleged that discovery might show that Defendants regularly engage in the practice of creating forged releases.  *See id.*

"A plaintiff may allege either an unlawful, an unfair, or a fraudulent act to establish liability under the UCL."  *Marques v. Wells Fargo Bank, N.A.*, No. 16-cv-03973-YGR, 2016 WL 5942329, at *8 (N.D. Cal. Oct. 13, 2016) (citing *Cel-Tech Comm., Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999)).  "As to the unlawful prong, the UCL incorporates other laws and treats violations of those laws as unlawful business practices independently actionable under state law."  *Johnson v. Select Portfolio Servicing, Inc.*, No. 15-cv-9231-JFW, 2016 WL 837895, at *4 (C.D. Cal. Mar. 3, 2016) (citation omitted).  "A business practice is 'unfair' when that practice 'either offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'"  *Id.* (citing *McDonald v. Coldwell Banker*, 543 F.3d 498, 506 (9th Cir. 2008)).  "A business practice is 'fraudulent' if members of the public are likely to be deceived."  *Id.* (citing *Prata v. Superior Court*, 91 Cal. App. 4th 1128, 1146 (2001)).

As mentioned above, the FAC limits Plaintiff's UCL claim to the unlawful prong, rather than the fraudulent or unfair prongs.  *See* FAC ¶¶ 110-16; *see also* Opp'n at 25 (conceding that Plaintiff's "UCL claim is predicated on the 'unlawful' prong . . . . [and that a cited case] has no application to [Plaintiff's] UCL claim based on unlawful business practices.").  Though Defendants' alleged actions regarding the Purported Release might potentially form a UCL claim based on the unfair or fraudulent prongs, because Plaintiff has *expressly limited* the FAC to the unlawful prong, the Court would dismiss this claim.  The FAC alleges no violation of another law on which to house an "unlawful" UCL claim.  Plaintiff only mentions one statute in the UCL claim, alleging that Defendants' "practice or practices are criminally unlawful in that they violate California Penal Code section 470 and 18 U.S.C. section 1343."  *See* FAC ¶ 113.  Nowhere in the Opposition does Plaintiff explain how the allegations in the FAC amount to a violation of the California Penal Code.  *See generally* Opp'n.  In addition, even if the FAC hinged the UCL claim on the Lanham Act violations, for the reasons stated above those claims fail and so too

would this claim.

**IV. <u>Conclusion</u>**

For the foregoing reasons, the Court would **DISMISS** all four claims in the FAC.  As to the three Lanham Act causes of action, the Court would dismiss them without prejudice to give Plaintiff an opportunity to overcome the issues discussed above (to the extent she can).  As to the UCL claim, the Court would also dismiss that cause of action without prejudice and allow Plaintiff to amend the FAC to plead a UCL claim based on the fraudulent and unfair prongs or to adequately plead a UCL claim based on the unlawful prong.